1           UNITED STATES DISTRICT COURT

2           CENTRAL DISTRICT OF CALIFORNIA

3      HONORABLE ANDREW J. GUILFORD, JUDGE PRESIDING

4  GENES INDUSTRY, INC.,              )
                                      )
5                                     )
                                      )
6                      Plaintiff,     )
                                      )
7                                     )
                                      )
8          Vs.                        )   No. SACV15-476-AG
                                      )
9                                     )
                                      )
10 CUSTOM BLINDS COMPONENTS, INC.,    )
                                      )
11                                    )
                                      )
12                     Defendant.     )
                                      )
13 _____  )

14

15

16           REPORTER'S TRANSCRIPT OF PROCEEDINGS

17                  *JURY TRIAL, DAY 1*

18                      *VOLUME I*

19                SANTA ANA, CALIFORNIA

20             TUESDAY, OCTOBER 3, 2017

21

22

23           MIRIAM V. BAIRD, CSR 11893, CCRA
          OFFICIAL U.S. DISTRICT COURT REPORTER
24         411 WEST FOURTH STREET, SUITE 1-053
             SANTA ANA, CALIFORNIA 92701
25                 MVB11893@aol.com

1                      **A P P E A R A N C E S**

2

3    **IN BEHALF OF THE PLAINTIFF,**      **SEAN M. KNEAFSEY**
     **GENES INDUSTRY:**                  KNEAFSEY AND FRIEND LLP
4                                         800 WILSHIRE BOULEVARD
                                          SUITE 710
5                                         LOS ANGELES, CA 90017

6

7

8

9

     **IN BEHALF OF THE DEFENDANT,**      **ELIZABETH YANG**
10   **CUSTOM BLINDS COMPONENTS,:**       LAW AND MEDIATION OFFICE OF
                                          ELIZABETH YANG
11                                        1001 FREMONT AVE
                                          NO. 3808
12                                        SOUTH PASADENA, CA 91030
                                          - AND -
13                                        **GEORGE L. STEELE**
                                          LAW OFFICE OF GEORGE L
14                                        STEELE
                                          2222 FOOTHILL BOULEVARD
15                                        suite 301
                                          LA CANADA, CA 91011
16

17

18

19

20

21

22

23

24

25

                      UNITED STATES DISTRICT COURT

1          SANTA ANA, CALIFORNIA; TUESDAY, OCTOBER 3, 2017; 9:00 A.M.

2                              ---

3              THE COURT:  Good morning, everyone.

4              MR. KNEAFSEY:  Good morning, Your Honor.

5              MR. STEELE:  Good morning, Your Honor.

6              THE COURT:  All right.  We are here in

7      SACV 15-1476-AG, Genes Industry versus Custom Blinds and

8      Components.

9                  Please give your appearances.

10             MR. KNEAFSEY:  Good morning, Your Honor.  Sean

11     Kneafsey on behalf of the plaintiff.

12             MR. STEELE:  Good morning, Your Honor.  George

13     Steele on behalf of Custom Blinds and Components, defendant.

14             THE COURT:  All right.  Thank you.  Be seated.

15                 Are you both ready for trial?

16             MR. STEELE:  Yes, Your Honor.

17             MR. KNEAFSEY:  Yes, Your Honor.

18             THE COURT:  Okay.  Then I have a few questions for

19     us.  I have this down for four days.  Is that people's

20     understanding?

21             MR. KNEAFSEY:  I think we'll probably finish in

22     four, Your Honor, but it was my understanding we had reserved

23     five.

24             THE COURT:  I think at the pretrial conference we

25     reduced it to four.  You've given me a list of witnesses with

```
 1    timing.  How do the plaintiffs play off of those witnesses?
 2    I mean, how do the defendants play off those witnesses?  What
 3    is your most recent witness list?  When was it filed?
 4             MR. STEELE:  I think back in June.  We had
 5    originally planned for three witnesses.  I think in reality
 6    we'll probably just be calling one.
 7             THE COURT:  Which one of those?
 8             MR. STEELE:  Paul Shieh.
 9             THE COURT:  Okay.  So you also had down Ms. Yao,
10    Y-a-o, and Ms. Liu, L-i-u?
11             MR. STEELE:  Correct.  Possible but not likely.
12             THE COURT:  All right.  So we'll use that as your
13    witness list.
14             Please be seated.  You had mediation in front of
15    who?
16             MR. KNEAFSEY:  The attorney panel, Your Honor.
17             THE COURT:  Pull that closer to you.
18             MR. KNEAFSEY:  The attorney panel, Your Honor.
19             THE COURT:  Okay.  And that was unsuccessful?
20             MR. KNEAFSEY:  It was, Your Honor.
21             THE COURT:  Are you close enough to keep talking?
22             MR. KNEAFSEY:  I don't believe so, Your Honor.
23             THE COURT:  Okay.
24             Now, I looked in the jury instructions, and I saw
25    none disputed at this point.  So we're set on jury
```

```
 1    instructions.

 2              MR. STEELE:  Yes.

 3              MR. KNEAFSEY:  Yes, Your Honor.

 4              THE COURT:  All right.  And there was a request to

 5    play the video?

 6              MR. KNEAFSEY:  Yes, Your Honor, the judicial

 7    counsel video.

 8              THE COURT:  Yes.  And when did you want to play

 9    that?

10              MR. KNEAFSEY:  Prior to opening statements.

11              THE COURT:  Before opening.  And you have it ready

12    to play?

13              MR. KNEAFSEY:  Yes, Your Honor.

14              THE COURT:  Okay.  Well, I usually give short

15    instructions at the beginning just before opening, so that

16    would be a good time to play it.

17              MR. KNEAFSEY:  I believe we put a placeholder in

18    the jury instructions for it to be played at the end of your

19    preliminary instructions, Your Honor.

20              THE COURT:  Okay.  Then we will do that.

21              Now, speaking of the jury instructions, it's my

22    growing practice to allow jurors to answer questions [sic].

23    Any dispute to that?

24              THE CLERK:  To ask questions.

25              THE COURT:  I'm sorry -- to ask questions.
```

```
 1              MR. KNEAFSEY:  To submit questions to the Court and
 2    then have the Court read the question?
 3              THE COURT:  Yes -- discussing with counsel when
 4    appropriate.
 5              MR. STEELE:  No objection here.
 6              MR. KNEAFSEY:  No objection, Your Honor.
 7              THE COURT:  What I'm going to tell them to do is
 8    they will have notepads.  If they have a question, they can
 9    put it on that corner of the jury box.  I'll gather them, see
10    if they raise any issues to discuss.  I won't ask all of them
11    necessarily, but I'll read the general instruction on jury
12    questions if they have any.  Okay.
13              Now, we are not timing this trial, but we're aiming
14    for four days and you're saying maybe five.  That means they
15    have to come back next Tuesday if I tell them five.
16              MR. KNEAFSEY:  I believe we'll finish in four, Your
17    Honor.
18              THE COURT:  It's going to create problems.  So how
19    did we get down to four, and why are we now back up to five?
20    I know we had talked about five.
21              Okay.  I'm going to tell them four or five, and I
22    just encourage you to speed along.
23              Ms. Bredahl, we may have a little bit of trouble in
24    jury selection because of the Jewish holidays this week, so
25    I'm a little concerned about moving this along.
```

```
 1              All right.  There will be an interpreter; is that
 2    correct?
 3              MR. KNEAFSEY:  Your Honor, we decided not to use an
 4    interpreter, so there will be no interpreter.
 5              THE COURT:  Okay.
 6              MR. KNEAFSEY:  Your Honor, I have submitted
 7    proposed voir dire which referenced an interpreter, use of an
 8    interpreter.  So that proposed question is no longer
 9    necessary.
10              THE COURT:  I looked at your proposed voir dire
11    questions.  Do you know whether it's voir dire or voir dire?
12              MR. KNEAFSEY:  I don't, Your Honor.
13              THE COURT:  Well, I have the answer for you.
14              MR. KNEAFSEY:  Thank you.  Voir dire.
15              THE COURT:  Whatever the judge says it is, and this
16    judge doesn't know.  He has a wonderful clerk here from
17    Texas.  How do we say it?  Voir dire.  Say whatever you like.
18              Okay.  I have your questions.  Let me ask, are
19    there any particularly unique issues here except for
20    nationality which -- are both Taiwanese maybe?
21              MR. KNEAFSEY:  Yes, Your Honor.
22              THE COURT:  So it's kind of a push on that.
23              MR. KNEAFSEY:  Yes.
24              THE COURT:  I will just say we are an American
25    court and we welcome everyone.  I won't get deep into that,
```

```
 1    but I'll just say no bias or prejudice based on parties.  Any
 2    other -- you mentioned patent law.  Do you have issues on
 3    patent laws?  I'll ask about that.  I think -- did you
 4    mention trolls?  I think you mentioned trolls?
 5              MR. KNEAFSEY:  I did --
 6              THE COURT:  Let me just ask.  Just be blunt in that
 7    regard.  Are you a troll?
 8              MR. KNEAFSEY:  No.  No.  We practice the invention.
 9    We're not a troll.
10              THE COURT:  Genes sound more like DNA than blinds.
11    But you're not a troll?
12              MR. KNEAFSEY:  We're not a troll.
13              THE COURT:  Do you want me to ask the troll
14    question?  Do you want them thinking that you might be a
15    troll?
16              MR. KNEAFSEY:  You're correct, Your Honor.  No.
17              THE COURT:  Okay.  Understood.  Understood.
18              Okay.  We have about 130 exhibits.  We do have
19    motions in limine and rulings have been issued on that.
20    Okay.  Now, on the short statement, let's see.  As we
21    probably talked at the pretrial conference, there's two ways
22    to go -- me to read a short statement or each side to talk
23    for two minutes in a non-argumentative fashion.
24              Here have we decided on a short statement for me to
25    read?
```

```
 1            MR. KNEAFSEY:  We have agreed on a proposed
 2     statement.  It might be more effective if we're allowed just
 3     to speak for a minute or two to the jury.
 4            THE COURT:  Okay.  Would both sides be willing to
 5     speak for a minute or two to the jury panel non-argumentative
 6     about what's involved in the case?
 7            MR. STEELE:  Yes.
 8            THE COURT:  Okay.  So both sides will do that.
 9            Now, in the instructions you begin with what I
10     would call the one series.  Yeah, 1.3 I see you have.  Then
11     you have -- then you jump to the circuit.
12            Let me ask this:  In the Ninth Circuit instruction,
13     you have the ones -- the one-series ones that you want.
14            MR. KNEAFSEY:  Yes, Your Honor.
15            THE COURT:  Okay.  Are you with me on the one
16     series?  You're now the jury.  This is witness.  This is
17     evidence.  This is circumstantial -- because I will read that
18     at the beginning.  I see you have those.
19            The Ninth Circuit one series.  Okay.  I see you
20     have that.  I will read that before opening statement.
21            Let me ask, do you know which verdict says -- well,
22     what is the verdict I should read at the first break, which I
23     actually read during consultation, which is probably
24     instruction number 14.  I will now say a few words about your
25     conduct as jurors.
```

1          I say that during voir dire when we're picking a

2     jury.  I say it to everyone, because they shouldn't even be

3     chatting then.  Okay.  Are you with me?  It the one that says

4     don't chat, don't research, don't do anything.

5          MR. KNEAFSEY:  Yes.

6          THE COURT:  Okay.  I think I sent out how we

7     conduct voir dire.  We call it Arizona blind strike, typical

8     Arizona blind strike.  Not everyone does it.  It has growing

9     popularity within federal court.  Do you have any questions

10    about how the process works in the Arizona blind strike?

11         MR. KNEAFSEY:  I do, Your Honor.

12         THE COURT:  Please.  Let me just say, I encourage

13    instruction.  Some of the simplest questions, some of the

14    simplest questions that may seem stupid turn out not to be

15    stupid.  And there's some flexibility in applying these

16    instructions.

17         Keep that in mind, partly based on timing, when the

18    break ends.  Do we really have 40 people that have to stay

19    over time because we're sticking strictly to instruction?  So

20    there's some flexibility based on timing.  Questions are

21    encouraged.  Sometimes there's variation.

22         Sometimes the judge will forget, oh, this group

23    hasn't read their bios or whatever.  So sometimes there's

24    mistakes that I make.  Sometimes there's simple instructions

25    that I urge you to question at all time.

1          Also, before we make hardships or cause dismissals,

2     if you want a chance to rehabilitate, feel free.  Sometimes I

3     may conclude this person is just clearly a hardship and I may

4     or may not give you a chance to rehabilitate.  If you want a

5     chance to rehabilitate, speak up.

6          On the issue of how much talking should the

7     attorneys do, a lot of and I'm even told most federal judges

8     don't allow attorney voir dire.  I allow it, but it's

9     limited.  I allow it certainly to give you a chance to ask

10    questions you think I should have asked that I didn't ask.  I

11    allow it going to the issue of bias.

12         I don't like questions like what's your favorite

13    book and things like that.  I always state that those tend to

14    go to proclivities, but they don't go to biases.  We're here

15    to determine bias.

16         For the record, on bias let me tell you something a

17    judge never told me when I was an attorney.  I look to how

18    they answer the question:  Can you be fair and impartial?

19    That's the money question.  If you're rehabilitating, have

20    them say something contrary to what they said on can you be

21    fair and impartial.

22         Other questions have far less impact for me.  The

23    question I'm looking at is:  Can you be fair and impartial?

24    So keep that in mind when you're asking questions.  Usually

25    someone who says they think they can be fair and impartial I

```
1    don't think creates a for-cause.  I'm just telling you.  You

2    know, on the issue of rehabilitation they say I think I can

3    be fair and impartial.  Don't conclude that that's enough for

4    cause.

5            So there's some general statements about voir dire

6    rules.  Do you have any others?

7            MR. KNEAFSEY:  May I ask a procedural question?

8            THE COURT:  Yes, please.

9            MR. KNEAFSEY:  So the Court will bring in 14

10   prospective jurors and then --

11           THE COURT:  Did you say 14?

12           MR. KNEAFSEY:  Yes.  Well, I'm sorry.  The total

13   panel is 36.

14           THE COURT:  Yeah.  We'll bring in 36 here.

15           THE CLERK:  We had 21 at last count.

16           THE COURT:  Only 21?  The regular panel is 20.  We

17   had 21 at last count.  That was about a half hour ago.  I'm a

18   little worried about that with the Jewish holidays.  They

19   will be spread out in the back, and the people in the back

20   are also in play.

21           MR. KNEAFSEY:  And then our peremptories will be

22   directed at the first eight?

23           THE COURT:  No.  Your peremptories will be directed

24   at the whole group, but always be doing the math.  It will be

25   an eight-person jury.  Each side gets three peremptories.  So
```

1    it's the first 14.

2         After we've exercised hardships and cause -- you

3    don't want to be exercising a peremptory against the 20th

4    juror back there.  Understand?  It's just going to be after

5    everything is done, it will be the last eight starting here

6    and moving back.  It will be the last eight.

7         If there are limited numbers of hardships or

8    for-cause, the only people in play are the first 14 with six

9    peremptories.  So you wouldn't be wanting to exercise your

10   peremptory against juror number 23 out there.  Okay?

11        MR. KNEAFSEY:  So we exercise our peremptory

12   against juror number 8, and that's the only juror --

13        THE COURT:  No.  You could exercise it against

14   number 12 because the other side may exclude number 8, which

15   puts number 9 in play.

16        MR. KNEAFSEY:  Right.

17        THE COURT:  The other side can exclude three of the

18   first six, which would put others in back in play.  Okay?

19        MR. KNEAFSEY:  Yeah.

20        THE COURT:  That's why I take -- it's 14, because

21   it's maximum three each.  Usually all the peremptories are

22   exercised.  So it's 14.  As it plays out, feel free to ask.

23   You'll see how we're going.

24        MR. KNEAFSEY:  And it's three and only three where

25   both sides --

```
 1            THE COURT:  If you look at the sheet -- we handed
 2       you a sheet where you will be able to consult with your
 3       client and give me your three peremptories.  Do you see that
 4       sheet in the package?
 5            MR. KNEAFSEY:  I do, Your Honor.
 6            THE COURT:  The reason there's six is because you
 7       may duplicate your peremptories.  And if you duplicate, we
 8       just go down to your next.
 9            MR. KNEAFSEY:  Thank you, Your Honor.
10            THE COURT:  You may ask where's the fairness in
11       that.  There is some strategy, although it really doesn't
12       play out this way, but there's some strategy in how you list
13       your peremptories.
14            You might want to list last the ones you think the
15       other side will preempt.  If you list them first, they'll be
16       charged against you instead of them.  You follow what I'm
17       saying?
18            MR. KNEAFSEY:  Yes, Your Honor.
19            THE COURT:  Though sometimes I scratch my head:  Is
20       that fair?  That is actually what would happen in, like, a
21       normal six-pack.  You speak, preempted.  You speak,
22       preempted.  You speak, preempted, and he says, great, I
23       didn't like that guy.  And he gets a free one.
24            It's the same way in how you order them on that
25       list.  Okay?  So that's why there's six.
```

```
1              MR. STEELE:  If I may.

2              THE COURT:  Absolutely.

3              MR. STEELE:  As opposed to the traditional

4    six-pack, we're going to make all the preempts at one time on

5    paper.

6              THE COURT:  On the paper, yes.  This will be after

7    we have excluded everyone.  Just sit down and write your

8    preempts out.  And again, you might want to consider the

9    order.

10             MR. STEELE:  Fair enough.

11             THE COURT:  Okay.  Anything else?  Anything else on

12   voir dire?

13             MR. KNEAFSEY:  No, not from the plaintiff,

14   Your Honor.

15             THE COURT:  Okay.  Then there's a lot of depo

16   transcript reading.  Will these be presented by video or how?

17             MR. KNEAFSEY:  By video, Your Honor.

18             THE COURT:  And do I need to rule on any

19   objections?

20             MR. KNEAFSEY:  No, Your Honor.

21             THE COURT:  Thank you.  May I commend you both for

22   your great organization here.  I have worked sometimes late

23   at night reading objections in depo transcripts because the

24   attorney needs to read them the next day.  I'm glad I will

25   not need to be doing that.  If something changes and you need
```

```
 1    me to do that, please give me as much lead time as possible
 2    on such.
 3           Okay.  We have a jury deliberating right now in a
 4    patent case that ended last week, and they're deliberating.
 5    But it won't affect you because we took them next door;
 6    right?
 7           THE CLERK:  They're down the hall.
 8           THE COURT:  They lost their view.  So we'll be
 9    using this jury room for them.
10           Now, can I ask, do you have a damages expert?
11           MR. KNEAFSEY:  Yes, Your Honor.
12           THE COURT:  Can you tell me what damages that
13    expert will be suggesting?
14           MR. KNEAFSEY:  Lost profits, Your Honor, and a
15    reasonable royalty as an alternative.
16           THE COURT:  And the total is?
17           MR. KNEAFSEY:  Just over a million dollars.
18           THE COURT:  Just over a million?
19           MR. KNEAFSEY:  Yes, Your Honor.
20           THE COURT:  Okay.  In the last case, the technical
21    expert fees were 400,000, with maybe another hundred thousand
22    for the trial.  The damages expert fees I think were 300,000,
23    and the damage expert said the damages are 660,000 -- vastly
24    exceeded by the experts.
25           I take seriously my obligation to be proportionate
```

1    under the Federal Rules of Civil Procedure and to move things

2    along.  Keeping in mind that this is a low seven-figure case,

3    let's make sure the time we invest and require the jury to

4    invest is commensurate with a low seven-figure case.

5           All right.  Anything else?

6           MR. KNEAFSEY:  Your Honor, the Court granted our

7    motion in limine number one, which had to do with a new

8    noninfringement theory that the defendants had asserted.  I

9    addressed this in the trial brief.

10          In my communications with counsel prior to trial,

11   I'm concerned that the defendant may try and interject that

12   theory into the case.  The Court did indicate in its ruling

13   it was without prejudice to revisit it at trial, and we have

14   certainly prepared our entire case in accordance with the

15   Court's ruling that that theory will not be coming into

16   evidence.

17          THE COURT:  All right.

18          What does the defense say about this?

19          MR. STEELE:  Well, first I disagree with the ruling

20   on the motion in limine.  We had discussed that at length --

21          THE COURT:  You disagree with what?

22          MR. STEELE:  His characterization.

23          THE COURT:  How do you disagree with it?  Did I not

24   rule that way, or did he not ask that, or what?

25          MR. STEELE:  Well, I think that there were some

```
 1    nuances to it that the Court explained to me at the time that
 2    we argued.  Now, when we argued, my question was:  Am I
 3    precluded from arguing the claim construction order set forth
 4    by this Court?  Now, the Court replied to me:  No.  Read the
 5    order.  This is what you cannot argue.  And what I could not
 6    argue according to the motion in limine was that a particular
 7    element rendered did not serve to securely fasten our device.
 8            Now, what that meant to me as I understood the
 9    Court was as long as I did not use the exact language the
10    Court had said was not permissible, I can still argue what
11    was in the claim construction order.
12            I mean, if the orders mean anything, all the
13    elements have to be satisfied.  The plaintiff's construction
14    of your ruling would be, well, we're going to rewrite the
15    order because we didn't think about the implications of one
16    of the elements not being met.
17            THE COURT:  All right.  So on motion in limine
18    number one to exclude and/or limit evidence in support of
19    defendant's new, quote, firmly-in-position, noninfringement
20    theory, it was granted without prejudice to revisiting at
21    trial.
22            Further, I said defendant is precluded from
23    introducing evidence or argument that the anchor lug of the
24    accused cord tilter does not serve to hold the cord tilter
25    firmly in position.
```

1          That's a pretty clear motion in limine.  I don't

2     know how I can be clearer about that.  What can I tell

3     people?

4          MR. STEELE:  My understanding is that I couldn't

5     refer to that particular element saying that it wasn't

6     securely fixed to the device.  The claim construction order

7     makes that a requirement.

8          Now, how can I abide by the order but not claim

9     that we're not firmly attached?  Now, I don't mind a world in

10    which I say I'm not firmly attached by anything and not refer

11    specifically to the anchor lug, which is what I think that

12    order says and what I understood the Court to be telling me

13    at the time.  Because otherwise we're rewriting the claim

14    construction order.

15         We're writing out -- based on a motion in limine,

16    we're eliminating an element that was found to be part of the

17    claim in claim construction, if we're to interpret it the way

18    plaintiff suggests.

19         THE COURT:  Do you intend to raise this issue in

20    your opening statement?

21         MR. STEELE:  Yes.

22         THE COURT:  Okay.  We have a serious issue, then.

23    I gave a specific statement here.  It specifically states it,

24    and I do not think in your opening you should discuss

25    evidence or argument that the anchor lug of the accused cord

1   tilter does not serve to hold the cord tilter firmly in

2   position.  You can't say that in opening.  Can't say that at

3   trial.  That's the ruling.  I don't know what else I can tell

4   you.

5           MR. STEELE:  Well, I think what plaintiff wants to

6   do is preclude me from using the fact that the device is not

7   firmly attached at all when the order says the anchor lug,

8   that I can't argue that the anchor lug doesn't serve to do

9   it.

10          What I'm saying -- it's just not firmly attached.

11  I don't care why it's not firmly attached.  It's just not

12  firmly attached.  That seems to be within the scope of the

13  order.  I just can't use that term anchor lug.

14          THE COURT:  Tell me your view.

15          MR. KNEAFSEY:  Your Honor, I'm not quite following

16  defendant's counsel.  The Court construed anchor lug to being

17  a projection on an object to serve to hold the object firmly

18  in position.

19          The defendant never raised this argument in

20  discovery, so we filed a motion in limine to preclude the

21  defendant from arguing that the anchor lug limitation is not

22  met for not having to firmly hold the cord tilter in

23  position.  And that is what we prepared this entire case in

24  reliance on.

25          If defendant is arguing that they can just make the

```
 1   same argument using different words, we have a strong
 2   objection to that.  There's a specific interrogatory asking
 3   the defendant to assert their noninfringement position, and
 4   there was one noninfringement position asserted.  It was the
 5   lack of a latching lug.
 6           Our expert, noninfringement expert, has analyzed
 7   this whole case in reliance on what the noninfringement
 8   positions are.  So for now, for the defendant to be able to
 9   come in and assert on the morning of trial a new
10   noninfringement theory would severely prejudice the
11   plaintiff.
12           THE COURT:  All right.  All I can say is I think I
13   understand the arguments.  We looked at them when we made the
14   motion in limine, and the motion in limine is our response to
15   all of this, and I will enforce that.  If you wish to object
16   to something the defense says, I'll have to see if it's
17   within the context of this motion in limine.  It's the best I
18   can do.  We've already argued the motion in limine.  I really
19   don't want to reargue it now.
20           MR. KNEAFSEY:  Thank you, Your Honor.  And the
21   opening statement is particularly important --
22           THE COURT:  I don't know what else I can say.
23           MR. KNEAFSEY:  Okay.
24           THE COURT:  Okay.  There it is.  We can't reargue
25   the motion in limine.  The motion in limine is what it is.
```

1          MR. STEELE:  Your Honor, one last question.  So we

2     are not -- I can rely on the claim construction order as

3     written?

4          THE COURT:  When you say rely on the claim

5     construction order, how does that go with what you've

6     assigned as invalidity?  I mean, you say rely on the order.

7     You rely on the status of affairs, and you tell me what your

8     arguments are.  I said invalidity.  I meant infringement.

9          So I -- I don't understand why you keep going back

10    to the claim construction.  You identified what you thought

11    was infringement.  Plaintiff is saying you didn't identify

12    this.

13         MR. STEELE:  I would differ a little bit.  First,

14    different counsel was present at the time.

15         THE COURT:  Here's my problem.  Different counsel

16    was present.  We argued it.  It's not a good time to be

17    rearguing it.  What is your direct question?

18         MR. STEELE:  My direct question is the claim

19    construction order which I understand to set forth the

20    elements which must be met to constitute infringement, if

21    that's still in force.  We're not changing that order.

22         THE COURT:  The claim construction order doesn't

23    say the elements must be met to constitute infringement.

24    That's what the law says.  You need to identify what

25    infringement arguments you're going to make.  Plaintiff is

1    saying you didn't identify what we've identified in our

2    motion in limine.  Do I have that correct?

3         MR. KNEAFSEY:  Yes, Your Honor.

4         THE COURT:  So we're not looking at the claim

5    construction.  We're not reevaluating the law that all the

6    elements must be met.  We're just evaluating what you

7    identify as a missing element for infringement, and the

8    plaintiff said they've relied on what you've identified and

9    what you didn't identify, whether it's in the claim

10   construction or not.  So I'm confused.

11        MR. STEELE:  I'm just saying if the elements --

12        THE COURT:  If the elements are the elements and

13   you didn't identify them as an element that precludes

14   infringement, then you can't bring them up now.  That's all

15   I'm saying.  That's what infringement contentions are all

16   about.

17        MR. STEELE:  Let me get a little clearer on this.

18   My understanding was that the elements must be met

19   regardless.  It's the law and it's also the law of this case

20   based on the orders.

21        THE COURT:  But you also must identify your claim

22   of noninfringement and why.

23        All right.  What else further do you have to say?

24        MR. STEELE:  I can rely on the motion in limine

25   ruling as written at this point?

```
 1              THE COURT:  Yes.  We're clear on that, and we'll
 2    have to see how it applies.
 3              MR. STEELE:  Fair enough.  Thank you.
 4              THE COURT:  All right.  Anything else on that?  We
 5    can't argue this again.  We need to move on.  It is what it
 6    is.
 7              MR. KNEAFSEY:  Okay.
 8              THE COURT:  I mean, I have a motion in limine where
 9    I'm very clear on what I've said.
10              MR. KNEAFSEY:  Nothing further, Your Honor.
11              THE COURT:  Okay.  Anything else, then, on that?
12              MR. KNEAFSEY:  Nothing on motions in limine.
13              THE COURT:  All right.  Anything else?
14              MR. KNEAFSEY:  Witness presence, Your Honor.
15    Mr. Chou is the president of the plaintiff.
16              THE COURT:  Ask a question.  Tell me what you want
17    me to do and then give me all the background facts.
18              MR. KNEAFSEY:  May Mr. Keene -- I haven't discussed
19    this with counsel -- remain in the courtroom?  He is the
20    marketing director at Genes.  He will be testifying.
21              MR. STEELE:  I'd make a motion to exclude and
22    admonish any witnesses other than --
23              THE COURT:  I don't know what admonish means here,
24    but if you want to exclude potential witnesses, they will be
25    excluded.  Would you like to exclude that witness?
```

UNITED STATES DISTRICT COURT

1              MR. STEELE:  Yes, Your Honor.

2              THE COURT:  What's your contrary argument to that?

3              MR. KNEAFSEY:  That's fine.  We'll agree to it.

4              THE COURT:  It's the rules.

5              MR. KNEAFSEY:  What about experts, Your Honor?  May

6      experts be present?

7              THE COURT:  What does the defense say about

8      allowing experts to be here?

9              MR. STEELE:  I make the same motion.

10             THE COURT:  Okay.  There's some discretion in that

11     area.  Why do you want your expert here?

12             MR. KNEAFSEY:  Your Honor, there's -- the experts

13     will be opining on the evidence as it is presented at trial,

14     and a lot of this involves physical exhibits.  The experts

15     need to be able to hear the evidence as it comes in in order

16     to provide an effective opinion on that evidence.

17             THE COURT:  Do you have an opposing expert?

18             MR. STEELE:  No, we do not.  And I would object

19     also based on the grounds that the use of an expert doesn't

20     depend on testimony as it is given.  The expert is rendering

21     an opinion that, much like everything else we're talking

22     about in discovery, should track what was disclosed.

23             THE COURT:  There is --

24             MR. STEELE:  That shouldn't be affected by any

25     particular statement or non-statement that's made.

1          THE COURT:  There is some variation in the law

2     concerning the exclusion of experts.  But if I don't have an

3     agreement with the party, the experts will also be excluded.

4     That's the ruling.

5          Anything else?

6          MR. KNEAFSEY:  Nothing else, Your Honor.

7          MR. STEELE:  Nothing else, Your Honor.

8          THE COURT:  All right.

9          Ms. Bredahl, how quickly until we get someone up

10    here?

11         THE CLERK:  Probably about 15 minutes.

12         THE COURT:  Okay.  Let's bring them up and we'll be

13    ready to go then.

14         Thank you.

15         MR. STEELE:  Thank you, Your Honor.

16         (Recess taken from 9:31 a.m. until 9:53 a.m.)

17         THE CLERK:  Item two, SACV 15-476, Genes Industry,

18    Incorporated, versus Custom Blinds and Components,

19    Incorporated.

20         THE COURT:  All right.  Welcome, everyone.  Welcome

21    to the United States District Court.  So I want to begin by

22    saying I've been where you folks have been, seated out there

23    wondering if you're going to serve on jury duty.

24         Sometimes at this point I wish to ask how many are

25    enthusiastic about serving, but I'm afraid to ask that

```
 1    question.  All right.  We've got a live jury.  They're
 2    laughing.  That's good.  I'm not sure I'd be laughing, but
 3    here's the deal.  I know what you're thinking.  You've been
 4    subpoenaed.  I often get subpoenaed, and I keep them.  Do you
 5    keep yours?  I keep them.  These are all for the state court.
 6    I get them.
 7              And by the way, Ms. Bredahl, I'm due.  And I go
 8    over across the street to the state court and I sit out there
 9    and I wonder what you're wondering now.  So let's talk about
10    a few things.
11              You know, I do think it's important to serve on a
12    jury.  We live in a crazy world, right now particularly
13    crazy.  I think it's important to serve your country, and
14    serving on a jury is a modest way to serve your country.
15              We've seen people serve their community in Las
16    Vegas recently.  Serving on a jury is a modest way to
17    serve your country.
18              Here's the thing.  I've been doing this now for
19    11 years, and honestly there's people that don't want to
20    serve, and all of them except one -- are we still at one,
21    Ms. Bredahl?
22              THE WITNESS:  I think one.
23              THE COURT:  And maybe they're not being truthful to
24    me.  But when they're done, they come up and say:  You know,
25    I didn't want to do this, but I'm glad I did.  I'm glad I
```

1    served, and I'm glad I had this opportunity.

2           So if you're thinking you don't want to do it,

3    please give it a chance.  Here's my 4th of July speech.  I do

4    think the Constitution is the greatest achievement of humans

5    in the last thousand years.  We're going to be asking you

6    questions today.  Let me start:  Does anyone disagree with

7    that?  Anyone think something else is the greatest

8    achievement of humans in the last thousand years?  No one

9    wants to suggest that, so I guess everyone agrees.

10          Sometimes people say penicillin, landing on the

11   moon, atomic energy, information technology.  There's all of

12   those good things.  I actually think it's the Constitution.

13   It's the Constitution because it describes how we live and it

14   balances powers.

15          One way it balances powers is these two parties

16   here with a dispute don't get the dispute decided by me or by

17   the president or by the Congress.  They get it decided by

18   people sitting on a jury, and I think that's important.

19   That's one of the reasons why the Constitution is one of the

20   greatest achievements of the last thousand years.

21          So I hope you'll want to give a chance to serve

22   this great goal.  We'll be asking you questions.  I didn't

23   get much of an answer on the last one.  Let me ask you this

24   one.  This is a Family Feud question.  All right?  Good.

25   Maybe you'll answer.  We'll see who's the winner.

1          They took a poll on the greatest ways to serve your

2     country.  They did.  This is true.  And what is the greatest

3     way to serve your country?  Anybody?

4          Service.  Someone said service.  Number-one answer.

5     Sometimes people say serving on a jury, at which point I

6     think, gosh, I'm pretty good at this.  But it is serving in

7     the military.  So let's go to the number-two answer.  What's

8     the number-two answer?  Jury service?  No.  Not number-two

9     answer.  Number-two answer was paying taxes.  Oh, boy.

10         What's the number-three answer?  Jury duty.

11    Number-three answer was jury duty.  Military, taxes, jury

12    duty.  The nice thing about jury duty is no one will shoot at

13    you, and no one will make you write a check on April 15th.

14    We'll just need a little bit of your time.  Serving in the

15    military, taxes, serving on a jury.

16         Now, you know, if you're a citizen of the

17    United States, serving on a jury is required actually.  The

18    statute has a few exceptions for hardship, and we'll be

19    asking you about hardship.  But the exceptions are limited.

20         You know, I'm at a lot of parties here and there,

21    family parties, and sometimes people complain about sitting

22    on a jury.  I'm not the right person to complain to because I

23    will tell them it is important for them to be sitting.  And

24    these rules about excusing are kind of limited.

25         You know, if we excused every businessman with an

1    important meeting, it means no businessmen would sit on the

2    jury.  If we excused every businesswoman with an important

3    meeting, if we excused every doctor with an important

4    patient, it means we wouldn't have doctors or businesspeople

5    or teachers.  Now, sometimes these hardships are granted.

6    I'm just telling you it's a statute.

7            And there's two very hard things I do.  One is I

8    sentence people to jail, and they go through that door right

9    there (indicating).  And that's hard to do.

10           Another thing is I say:  I'm sorry.  You've got to

11   sit on this jury.  The hardness of that is diminished a

12   little bit because most people like it when they are

13   finished.  As I said, we've pretty much got about a hundred

14   percent approval ratings.  People feel good about serving

15   their country.

16           Also it's a chance to see how the jury system

17   works.  Some of you have already served on a jury, but I bet

18   not one of you have served on a federal jury.  I keep

19   explaining to people this is the United States District

20   Court.  There's no California flag there.  This is the Court

21   of the United States of America.

22           When should we have a separate court for the United

23   States as opposed to the state?  To me it's pretty important

24   because I'm a judge in the federal system, not the state

25   system.  We have special federal laws.  The Constitution of

 1   the United States, that same Constitution set up patent laws,

 2   and this is a patent case.  So it gets tried in federal

 3   court.

 4          I kind of think it's nicer here.  Maybe I'm wrong.

 5   Everyone except the judge is nicer and the facilities are

 6   nice.  What I'm saying here is it's a chance for you to see

 7   how a federal system works.  So at Thanksgiving when people

 8   say I sat on a jury, you can say I sat on a federal jury.

 9   And the audience will become hushed, and you can explain how

10   wonderful it was.

11          But seriously, folks, it is a federal jury, and it

12   is a little bit different.  Let's see.  I was a lawyer for

13   30 years, and I wished I had had the chance to sit on a

14   federal jury.  That's what you're doing here, sitting on a

15   federal jury.

16          Okay.  Now, I said I knew what you were thinking.

17   I should ask the question:  What's your number-one question?

18   Your number-one question may be:  How long is this jury trial

19   going to last?  We had a trial.  It was in the newspapers.

20   It was insider trading for some people in Orange County,

21   probably some of whom you know.  That trial lasted about ten

22   weeks.

23          We had a trial here, right here, sitting right over

24   at the defendant's table, where we convicted the sheriff of

25   Orange County of a crime.  That trial lasted how long,

```
 1    Ms. Bredahl?  I forget.

 2              THE CLERK:  Months.

 3              THE COURT:  Well, this case isn't going to last

 4    months.  It's not even going to last weeks.  It's going to

 5    last four to five days.  Four to five days.  That's pretty

 6    good.  Gets you in.  Gets you out.  Gets you an excuse for

 7    future jury duty for a certain amount of time.

 8              And if you don't serve now, it means the next one

 9    that comes up that they ask you to serve may be over at the

10    state or whatever.  Maybe you'll get stuck with one of those

11    that's three months or so.  Maybe it's good just to take the

12    four- or five-day jury and use that as an insurance policy

13    against a long case.

14              Actually when I'm sitting over there in state

15    court, I really want to serve.  I do.  I want to see how the

16    jury works.  You know, there's a play going on right now in

17    Santa Ana called 12 Angry Men.  You can be one of those men.

18    You could even be one of those women.  They should change it.

19    Isn't that interesting that it's 12 Angry Men.

20              But how does a jury work?  I'd love to sit over

21    there.  Even I might have trouble with a five-month trial

22    over there.  This is a short one, so I hope you'll have an

23    opportunity to serve.

24              Now, in a moment I'll ask if there's a hardship.

25    Maybe no one will have a hardship.  If they do, I'll have to
```

```
 1    think about what rules apply and determine who can sit.  Let
 2    me tell you what our schedule is.  We don't sit on Mondays.
 3    Mondays -- I've got maybe 400 other cases, and we have
 4    hearings and we have all sorts of other things going on on
 5    Mondays.
 6              We sit Tuesday, Wednesday, Thursday, Friday.  We
 7    sit basically 8:00 to 4:30.  Sometimes a witness just flew in
 8    and we need to get their testimony in and we might go to
 9    5:00.  Sometimes we might even start at 8:30 to get a witness
10    in.  But it's usually 9:00 to 430.  We take an hour and a
11    half at lunch, which seems long.  But if you are a
12    businesswoman, it gives you a chance to make phone calls and
13    get things done.
14              So we meet 9:00 to 4:30, an hour and a half off for
15    lunch, and two breaks, one in the morning and one in the
16    afternoon -- except on Friday, and this is a three-day
17    weekend.  So on Friday we let you go at 1:30.  We don't have
18    a break, and we start at 8:00.  So on Friday we start at 8:00
19    and we go to 1:30.  We don't take a lunch break.  It's almost
20    the same amount of time.
21              So Tuesday, Wednesday, Thursday, 9:00 to 4:30.
22    Friday, 8:00 to 1:30.  We will not meet Monday.  We wouldn't
23    anyway, but now it's a holiday.  You get to go home early on
24    Friday, either to be with family or maybe to finish up your
25    week's work.  We get ready for Monday's calendar.  That's
```

```
 1    where we put together all our motions for Monday.

 2              So that is likely the calendar we will be facing,

 3    and I will be asking you if that imposes a hardship.  But for

 4    now I want to talk about what this case is about.  So I would

 5    like each attorney -- we have two parties here, plaintiff and

 6    defendant in this civil case.  I'd like them to just maybe in

 7    two minutes describe the case.  Don't argue about the case.

 8    Just tell the good folks here what the case is about.

 9              We'll start with the plaintiff.

10              And we're talking to the people here in the box and

11    also the people back there.  So if you pick that up and put

12    it on the edge -- pick it up, just lift it up and put it

13    right on the edge right there.  Then you can talk to

14    everybody.

15              Go ahead.

16              MR. KNEAFSEY:  Thank you, Your Honor.

17              Good morning, ladies and gentlemen.  My name is

18    Sean Kneafsey and I represent the plaintiff in this case,

19    Genes Industry.  I'd like to introduce you to my client,

20    William Chou.  William is the president of Genes.  He owns

21    Genes with his wife Kara.  Kara is back there.  Kara is the

22    secretary of the corporation.

23              Genes is a window-covering components business.

24    That means they sell all the components that go into window

25    coverings such as that horizontal blind that you see over
```

```
 1       there in the corner of the courtroom.  Virtually all of the
 2       components -- and you can't see most of them because they're
 3       inside what's called the headrail -- have been designed by
 4       Mr. Chou himself.
 5              Mr. Chou founded Genes here in Orange County in
 6       1982.  The company is located about ten miles away in
 7       Placentia.  This case is about the design, Mr. Chou's design
 8       of a component called a cord tilter.  You can't see it from
 9       here, but it's inside that top headrail piece.  The cord
10       tilter is the mechanical component inside the blind assembly
11       that interacts with the cord that causes the blind slats to
12       open or close, hence the term cord tilter.
13              Mr. Chou was issued a patent on his invention by
14       the United States Patent and Trademark Office in 2004.  We
15       are here because Genes contends that the cord tilter that the
16       defendant sells, Custom Blinds and Components, infringes on
17       Mr. Chou's patent -- in other words, uses Mr. Chou's patented
18       idea.
19              Thank you.
20              THE COURT:  Thank you very much.
21              And is it Mr. Steele?
22              MR. STEELE:  Yes, Your Honor.
23              THE COURT:  Let's hear what the defense has to say.
24              MR. STEELE:  Good morning.  I'm George Steele, and
25       I'm counsel for Custom Blinds and Components, represented
```

UNITED STATES DISTRICT COURT

     1    here by Paul Hsieh who is manager of the company which is

     2    basically related to a business that was a family business

     3    started by his family.  You're going to see that actually the

     4    parties here do work in parallel since it -- since they've

     5    got a similar background before coming to the United States.

     6              They're both in the business that was just

     7    described by counsel, and in that business a lot of the same

     8    sorts of gadgets are used to achieve the same result, which

     9    is a blind that you can open and close.

    10              THE COURT:  All right.  Mr. Steele, you've got a

    11    very deep voice, but it's a big room and I want to make sure

    12    the court reporter hears you.

    13              MR. STEELE:  I'm sorry.

    14              THE COURT:  I like your deep voice, but when you

    15    turn and address the folks in back and stand further away, I

    16    don't know that the reporter can hear you.

    17              MR. STEELE:  Understood.

    18              THE COURT:  So speak up and be close to the

    19    microphone.

    20              MR. STEELE:  Can everyone hear me?

    21              There's not a lot I can add to this.  The dispute

    22    is whether or not a device that is integral to that

    23    particular contraption that we call a blind, he says ours

    24    violates his patent.  We say it does not.  He says that

    25    because of that, he lost sales because if it's true, then

```
1    people that might have bought his instead bought ours.

2          We say no because we're not the only two people

3    that sell those things.  So the questions before you are

4    going to be whether or not the devices are patently identical

5    in the sense that with respect to the patent law, each device

6    is exactly like the other.  And then if that is true, which

7    we contend it is not, how do you make it right?

8          So with that being said, I hope that you listen

9    carefully to all the evidence presented to you throughout

10   this trial.

11         Thank you.

12         THE COURT:  All right.  Thank you, Mr. Steele.

13         So it's a patent case.  You know, inventions.  When

14   they wrote the Constitution, they said a lot of things in the

15   Constitution.  But one of the things they actually said in

16   the Constitution is the United States will set up rules to

17   protect inventors, and we're going to hear about those rules.

18         Not surprisingly, sometimes inventors say some

19   people are violating those rules, and it's up to the jury to

20   decide is there a violation.  So the plaintiff here is

21   accusing the defendant of violating.  You just heard from

22   Mr. Steele saying we don't violate.

23         You're going to hear what constitutes a violation

24   and whether the defendants can be properly accused of

25   violation.  And here we have a model.
```

1          Now, we have patents on everything.  We just

2     finished -- we have patents on a lot of interesting science.

3     Here is an everyday object.  I am actually very interested in

4     how I'm going to learn about the technology and what the

5     claimed invention is and whether the competitors are

6     violating a simple blind design in this patent case.  So

7     that's what it is about.

8          Okay.  Now, we're going to be asking you questions,

9     I'm going to try and keep you informed about what's going on.

10    I'm hoping we'll have a jury picked by noon and let everybody

11    else go.  Sometimes it takes a little after noon.  Let's see

12    how long this takes.

13         We're going to be asking you questions, and our

14    goal as you might guess is to get a jury that's fair and

15    impartial.  Fair and impartial.  Our questions will be

16    designed to see if you can be fair and impartial.

17         Of course, the Constitution is important.  Patents

18    are important.  Juries are important, and your answers are

19    important.  So we need you to be answering these questions

20    under oath.

21         So I would ask Ms. Bredahl to please place you

22    under oath.

23         (Prospective jurors sworn)

24         THE COURT:  Thank you for that.

25         Does anyone have an issue with taking an oath?  Did

```
 1    anyone not take that oath?  Okay.  It looks like everyone

 2    took the oath.  Now we're going to start asking questions.

 3            Okay.  I told you how long it will take.  Here's

 4    your chance for you to tell me that you can't use this

 5    opportunity to serve your country, get a pass on future jury

 6    duty for a little bit here and at the state court.

 7            The question is:  Would serving on this jury create

 8    a problem for you based on the time estimate I said or maybe

 9    based on the fact that right now you've got a sore back or

10    any other issue beyond the time issue.  Now is your chance to

11    tell us if you are able to join this happy party.

12            Who would have trouble serving?  Is that a look of

13    regret on your face?  See, he wants to be here.

14            THE PROSPECTIVE JUROR:  My wife works a part-time

15    job 8:30 to 12:30.  We have a five-and-a-half-month-old we

16    don't have anyone to watch on Wednesday, Thursday, and

17    Friday.  She just got the job last week.  It's at an exercise

18    Barre3.  It's like a Pilates place.

19            THE COURT:  Okay.  Thank you for telling us that.

20    So do you think the United States should never have a young

21    father sitting on a jury?  That's kind of the question.  You

22    have some unique situation, new job for your wife.  I get it,

23    but those are kind of the rules that apply.  We'll let you

24    know.  Thank you for telling us that.

25            Yeah?
```

1          THE PROSPECTIVE JUROR:  Just we don't have anyone

2     to watch the child.

3          THE COURT:  I assumed that, yeah.

4          Okay.  Anybody else here?  Okay.  Front row down

5     here, juror number 4.

6          THE PROSPECTIVE JUROR:  Yes.  I am the only

7     full-time employee at my job.

8          THE COURT:  Uh-huh.  What's your job?

9          THE PROSPECTIVE JUROR:  I work for a psychiatrist.

10         THE COURT:  Don't you want to report back to him

11    the psychiatry of sitting on a jury?  What does he do when

12    you get sick?

13         THE PROSPECTIVE JUROR:  Well, it's one day maybe,

14    or come to work.

15         THE COURT:  Come to work.  Okay.

16         THE PROSPECTIVE JUROR:  And I'm the only one in my

17    household.

18         THE COURT:  Okay.  Anybody else?  All right.  Back

19    there, juror number 13.

20         THE PROSPECTIVE JUROR:  I'm the primary caregiver

21    for my two children, and my husband is actually leaving on a

22    business trip on Sunday that he had actually postponed.  It

23    was supposed to be last week.  So it causes a problem

24    especially in the afternoon.  The mornings I can handle with

25    your schedule, but the afternoons pose a problem with regard

```
 1    to picking up my children.
 2              THE COURT:  How old are they?
 3              THE PROSPECTIVE JUROR:  They are 10 and 14.
 4              THE COURT:  Thank you for that.
 5              Anybody else over on this group?  In the back?  I'm
 6    applauding.  No one has their hand up.  Thank you.  We'll get
 7    back to you on that.  Boy, do you ever hear people talk about
 8    juries, crazy juries or smart juries or how did OJ get free
 9    or how did OJ get convicted and all of that?
10              So we've got a young father and a young mother.
11    Sometimes circumstances come up that you've described.  But,
12    you know, part of it is maybe we need such people deciding
13    juries.  But again, we'll take it into account.  Thank you
14    for telling us that.
15              Okay.  Now, we get some controversial cases here.
16    This isn't one of them, unless you feel really strongly about
17    blinds.  We do get controversial cases.  We get police
18    brutality cases, because that's a constitutional issue.
19    Sometimes when you turn on the news, it's hard to listen to
20    news for more than 15 minutes without some story about cases.
21    So again, I think it's helpful for you to learn about cases.
22              We get police brutality, alleged police brutality
23    cases, and it's controversial, and we spend a lot of time
24    talking to the jury.  Do you like police officers?  Do you
25    not like police officers?  Do black lives matter?
```

1              In this case we don't have a lot of controversy.

2      You have heard it's a patent case about some blinds.  Let me

3      just ask.  Does anyone just at the beginning here, can you

4      tell me:  I can't possibly rule on this case because I hate

5      patents; I love patents; I can't deal rationally with issues

6      concerning inventions about blinds?

7              Does anyone have an issue being fair and impartial?

8      At this point we're going to talk more about it.  Anybody?

9      We also -- this is America, and this court is open to

10     everyone.  We have two people of -- I'm not sure of their

11     national origins, but we have differing national origins,

12     although it looks like the two parties have the same national

13     origin.

14             Can everybody be fair to everyone regardless of

15     national origin?  Regardless of accent?  Would that be an

16     issue, accents?  National origins?  Anything like that?

17     Okay.  Good.  We're moving along quite nicely, folks, and I

18     really, really appreciate your cooperation here.

19             Next, on the issue of fair and impartial, we want

20     to know if you're best friends with someone who's going to be

21     involved in this case or something like that.  Just because

22     you know someone doesn't mean you can't serve, but we need to

23     know that.

24             Sometimes we have some pretty famous people and

25     everybody knows them, and obviously we get a jury with people

```
 1    who know the people.  But here we're going to start
 2    introducing people and we'll see if you know anyone.
 3            Let me begin.  I am Judge Andrew Guilford.  Born in
 4    Santa Monica many years ago.  Spent many years in Orange
 5    County, and now I am a judge here.  Anyone ever hear of me?
 6    This is always fun.  No one ever hears of me.
 7            You know, if you hear about an umpire, they made a
 8    mistake.  If you hear about a judge, it's probably because
 9    they made a mistake.  So it's good that no one knows about
10    me.  That's good.  All right.
11            THE CLERK:  My name is Lisa Bredahl.  I'm the
12    courtroom deputy clerk to Judge Guilford.  I've been in
13    federal court for 16 years and with this judge for all of his
14    11 years.
15            And this is the court reporter, Miriam Baird.  It's
16    easier for me to introduce her than for her to take her hands
17    off the keys.  She's been with the federal court about ten
18    years.  She's been with Judge Guilford for the last four --
19    about four.
20            THE COURT:  Wow.  All right.  Anyone recognize
21    Ms. Bredahl or Ms. Baird?  You know, one of the things you
22    learn is this technology that Ms. Baird is doing right now.
23    You'll note that she makes just a few strokes with her
24    fingers.  It's not like typing.  It's more like a machine
25    that records shorthand, but they have now developed
```

```
 1   technology that has changed those strokes into words.  And I

 2   can sit here and read everything I say.  And then I always

 3   talk real fast and see if she gets it, and she always gets

 4   it.  Okay.

 5          So sometimes during the trial you'll see me looking

 6   at this just to see how the question was phrased or whatever,

 7   and it's very interesting, this technology.  This didn't used

 8   to exist for judges to get a realtime transcription.  It's

 9   very helpful to have that.

10          All right.  So no one knows me or the two wonderful

11   professionals in front of me.  And speaking of wonderful

12   professionals, as a judge I get clerks to help me.  Over here

13   we have a clerk who is going to introduce herself.

14          MS. KELLERHER:  Hi.  My name is Jenna Kellerher.  I

15   started with Judge Guilford two months ago.

16          THE COURT:  So she is a clerk, and she has a highly

17   technical background.  So she specializes in patent cases.

18   She knows patents through and through.  Does anyone know the

19   biggest patent court in the country?  Anybody?  Oddly enough

20   it's the Eastern District of Texas, just the way things

21   happen.  Most patent cases get filed in Sherman, Texas, and a

22   few close-by cities in the Eastern District.  She just spent

23   a year working in the Eastern District of Texas learning more

24   and more about patent law.

25          Anyone recognize her?  I don't see anyone.
```

```
 1              And here we have?
 2              MS. LESPERANCE:  Hi.  I'm Amy Lesperance.  I'm a
 3    third-year law student at Cornell, and I'm externing for the
 4    judge this semester.
 5              THE COURT:  So people in law school like a chance
 6    to see how courts work, which is kind of a fun thing.  She is
 7    going to a wonderful law school at Cornell, and she is
 8    spending ten weeks with us learning and helping out as you
 9    see here now.  Anyone recognize any of these folks?  I see
10    none.
11              So let's have the parties reintroduce themselves
12    and, you know, any corporate affiliates that may come into
13    play.  And let's see if anybody knows anybody.
14              Go ahead.
15              MR. KNEAFSEY:  My name is Sean Kneafsey.  My law
16    firm is the Kneafsey Firm, and we're located in Los Angeles.
17    This is my client, William Chou, of Genes Industries, and his
18    wife Kara.  Genes, as I mentioned, is located in Placentia,
19    California.  No affiliates.
20              THE COURT:  Okay.  Thank you.
21              And for the defense, Mr. Steele.
22              MR. STEELE:  Hello again.  Again, I'm George Steele
23    from the Law Office of George Steele.  I'm from La Canada,
24    California, professionally speaking.  I live in La Crescenta,
25    which is nearby.  This is my co-counsel, Elizabeth Yang.
```

1          MS. YANG:  Hello, everyone.  I'm Elizabeth Yang.

2    I'm co-counsel on behalf of defense, Mr. Paul Hsieh.  And I

3    am part of the Law & Mediation Offices of Elizabeth Yang.  We

4    have offices in Los Angeles County and Orange County.

5          MR. STEELE:  And again, you previously met Paul

6    Hsieh.

7          THE COURT:  Okay.  Anybody else?  Okay.  Anybody

8    recognize any of those folks?  Okay.

9          Now I'm going to read you the witnesses.  We need

10   to know if you recognize any witnesses.  This is always a fun

11   part because I have to pronounce their names correctly.  I

12   won't ask after each witness if anyone knows.  I just need

13   you to raise your hand as soon as you hear a name you

14   recognize.  It's up to you to raise your hand.  Okay.

15         So the first name here is Tser-Wen, otherwise known

16   as William Chou.  William Chou, Phil Keene, Dr. Jules Kamin,

17   Dr. James Rice, Kobe Bryant.

18         Now, you're laughing but you're not raising your

19   hand.

20         All right.  You know, I just threw him in.  These

21   poor ladies hear this all the time, and you're kind of tired

22   of it, I bet.  But I throw that in just to make sure you're

23   listening.  Kobe Bryant will not be a witness in this case,

24   I'm sorry to say.

25         It's also my way of testing how quickly we forget,

 1   although his number will soon be retired.  His numbers will

 2   soon be retired.  Kobe won't be a witness in the case, but I

 3   just need you to raise your hand if you recognize a name.  So

 4   that's why I mentioned that name.  I always like to say -- I

 5   don't know why I like to say this, but we did have Kobe

 6   Bryant as a party in this very court.

 7          Maybe you heard the case.  His mother was cleaning

 8   his room back in Pennsylvania and found his high school

 9   uniform and started selling it for lots of money -- Marion

10   High School.  And Kobe sued his mother saying:  Don't sell my

11   stuff.  I had that case here in court.  So we do get

12   interesting cases.  Kobe will not be a witness.

13          All right.  But raise your hand if you recognize

14   the names.

15          Next we have Paul Hsieh, H-s-i-e-h.  Can I have a

16   better pronunciation?

17          MR. STEELE:  Hsieh.

18          THE COURT:  Yes.  Sorry.

19          Then we have Michael Chen.  Then we have Reynaldo

20   Rivera.  Then we have Meng Yao, also known as Jessica Yao.

21   Then we have Maggie Liu.  I think I already mentioned Paul

22   Hsieh, Jessica Yao, and Maggie Liu.

23          All right.  Anybody recognize any of those

24   witnesses?  No one recognizes the witnesses.  Good.  Moving

25   on here.  Has anyone heard or read anything about this case?

1    I don't think this is a case that has made the news, so I

2    don't expect to see any hands on that.

3            A few general statements.  This is a civil case.

4    We're going to hear from each of you.  Some of you have no

5    doubt served on a jury.  In a civil case the burden of proof

6    is preponderance of the evidence.  Preponderance of the

7    evidence.

8            In a criminal case it's much higher.  It's beyond a

9    reasonable doubt.  So first, I just need to notify you this

10   is a civil case.  If you've done criminal cases or if you

11   watch Law and Order on TV or whatever, this isn't beyond a

12   reasonable doubt.

13           This is a preponderance of the evidence.  Parts of

14   it also might be something called clear and convincing, but

15   none of it is beyond a reasonable doubt.  So keep that in

16   mind.

17           Two other points.  We got the facts and we got the

18   law.  The facts are you folks.  The law is me.  You folks

19   determine the facts, not me.  It's all up to the jury.  The

20   facts have to be determined only on what you see in court.

21           Think about it for a second.  These attorneys are

22   going to know what facts you hear and they're going to make

23   arguments based on the facts you hear.  If you go out and do

24   independent research or learn a lot of other facts, it's not

25   fair to them because they don't know what they need to

1    explain or describe or talk about.  You have to base it only

2    on the facts here in court, not even on the facts you learn

3    out in the hallway.

4           You can't do any research.  You can't talk to

5    anybody.  It has to be based on the facts you hear in court,

6    and it has to be based on the law that I tell you.  I will

7    tell you what the law is on patents, how a patent works, and

8    what the law is.  And you've got to apply the law as I tell

9    it to you.

10          You know, when you think about, that law comes from

11   the Congress of United States, which is the people of America

12   voting together.  And since we live in the United States,

13   that's the law we need to apply.

14          So with that, let's start hearing from jurors

15   beginning here with juror number 1, Ms. O'Connell-Bogle.  I'd

16   like you to read from that piece of paper and tell us about

17   yourself.

18          This is always interesting.  You know, three

19   million people in Orange County.  It's a big, powerful,

20   strong, fascinating county.  And it's always interesting the

21   different jobs people have from Disneyland to wherever.

22          Tell us about yourself.

23          THE PROSPECTIVE JUROR:  My name is Jill

24   O'Connell-Bogle.  I live in San Clemente.  I am an elementary

25   school principal.  I have been in education.  I worked for

```
 1    Capistrano Unified for -- this is my 30th year.  I am
 2    married.  My spouse is also a principal.  He has been doing
 3    that for, like, 27 years.  I have a BA in economics from UC
 4    Irvine and a master's degree from Pepperdine.
 5            I have two adult children, one who is 26 and one
 6    who is 20.  One, my son, works in a rehabilitation mental
 7    illness facility and goes to school part time.  My daughter
 8    goes to San Francisco State and works as a resident
 9    assistant.  And I've never served on a jury.
10            THE COURT:  Thank you for that.  Principal where?
11            THE PROSPECTIVE JUROR:  At Oak Grove Elementary
12    School in Aliso Viejo.
13            THE COURT:  And your husband is at?
14            THE PROSPECTIVE JUROR:  Ambuehl in San Juan.
15            THE COURT:  Interesting.  Okay.  Next?
16            THE PROSPECTIVE JUROR:  My name is Deborah Kohls.
17    I live in Huntington Beach.  I am in sales, software sales,
18    cyber security specifically.  I've been doing that for about
19    27 years.  I am married.  My husband is retired, formerly a
20    VP with Bank of America.  He did that for about 30 years.  I
21    have a BA from National University.
22            I have an adult child, 41 years old.  He is a
23    senior vice president of strategy for an internet technology
24    company.  And I have served on a jury before.  It was a
25    criminal.  I guess DUI is criminal; right?
```

```
 1              THE COURT:  Yes.  Uh-huh.  All right.  Thank you
 2   for that.
 3              THE PROSPECTIVE JUROR:  Hello.  I'm Victor Silva.
 4   I live in Santa Ana.  I'm currently unemployed.  I'm not
 5   married.  I go to school at Santiago Canyon Community
 6   College, SCC.  I still don't know what I want to do.  Don't
 7   have any kids, and I've never served on a jury.
 8              THE COURT:  Thank you.  It took me a long time to
 9   figure out what I wanted to do, too, and I kind of fell into
10   this job.
11              Okay.
12              THE PROSPECTIVE JUROR:  My name is Maria Anchia.  I
13   live in the city of Orange.  I have two adult children, two
14   boys, 40 and 38.  One is a software engineer.  The other one
15   is a manager for a utility company.
16              I work for a psychiatrist.  I'm divorced.  My
17   ex-husband was a real estate agent.  At the present time he's
18   retired.  I have never served on a jury, and that's it.
19              THE COURT:  Okay.  Thank you.
20              Go ahead.
21              THE PROSPECTIVE JUROR:  My name is Stephen
22   Robinson.  I live in San Clemente.  I'm retired.  Previously
23   I had worked for San Diego Gas and Electric as a manager.
24   I'm married.  My wife owns a bookkeeping and income tax
25   preparation business, and she's been doing that for 15 years.
```

```
 1   I have a bachelor's degree in chemical engineering and a
 2   master's degree in business.  I got my degree at Berkeley and
 3   UCLA.  I've never served in the military.
 4          I have three stepchildren.  They are all adults in
 5   their early 40s.  Their employment is one works for AT&T as a
 6   project manager.  One works for Bertelsmann as an accounting
 7   clerk.  And the other one is currently unemployed.
 8          THE COURT:  Thank you.
 9          THE PROSPECTIVE JUROR:  My name is Brian Brennan.
10   I live here.  I reside in Santa Ana.  My occupation is coach
11   operator for Orange County Transportation.  You know it's in
12   Orange County.  My marital status, I'm married.  I have a
13   beautiful wife.  I have -- I also have two beautiful
14   daughters.  One is graduated from UCLA and also went to
15   Berkeley and UCI.
16          THE COURT:  Wow.
17          THE PROSPECTIVE JUROR:  My other daughter is
18   presently going to Cal State Fullerton.  She's going to --
19   well, I'm proud of my daughter.  She's going for a conference
20   over in Rutgers University to speak over there.
21          THE COURT:  Wow.
22          THE PROSPECTIVE JUROR:  My educational background,
23   I just have a little bit of college, okay, junior college.
24   My spouse, she's a homemaker for the last 25 years.  Like I
25   said, the number -- the two ages, one daughter is 23 and the
```

```
 1    other one is 20.  They both started college when they -- one

 2    started in ninth grade.  The other started at eleventh.

 3    Okay.  And so basically they're just students still.  Have I

 4    ever served in the military?  I have not.

 5              THE COURT:  All right.  Thank you.  You should be

 6    proud of your children and your, quote, beautiful wife.  I

 7    wonder if I was getting picked for a jury if I would say my

 8    beautiful wife.  That's lovely, I think.

 9              All right.  Now, go ahead.

10              THE PROSPECTIVE JUROR:  Good morning.  My name is

11    Scott Smith.  I'm 51 years old.  I'm the general manager of a

12    company called Fun Services.  We're a special events company.

13    Been there for almost 24 years.  I'm single.  Never been in

14    the military.  No formal education.  No children.  And I have

15    never served on a jury before.

16              THE COURT:  All right.  Thank you.  Let's pass it

17    over here.  It helps keep records a little better.

18              Thank you.

19              THE PROSPECTIVE JUROR:  Hi.  My name is Joey Price.

20    I'm from Rancho Mission Viejo.  My occupation is I'm in

21    behavioral health, actually recovery ministry in San Juan

22    Capistrano at a place called Sanctuary.  I'm the director of

23    operations there.

24              I'm married.  My wife is a -- works at Barre3 as an

25    administrative assistant.  Let's see.  My education is Sam
```

1    Houston State University in Texas.  I have a bachelor's of

2    marketing.  I have one daughter, five and a half months old.

3                THE COURT:  Okay.  Thanks.

4                THE PROSPECTIVE JUROR:  Hey.  My name is Jack Cole.

5    I am currently employed at Auto-Chlor System.  It's a

6    commercial dishwashing company.  I service dishwashing

7    machines and sell chemicals.

8                I'm currently engaged.  She is a hairdresser.

9    She's been doing that for five years.  My educational

10   background is I have got some college.  I didn't finish it.

11   I don't have any children, and I never served on a jury

12   before.

13               THE COURT:  All right.  Thank you, sir.

14               THE PROSPECTIVE JUROR:  Hello.  My name is Diane

15   Ryan.  I live in Huntington Beach.  I'm a retired adult

16   education and community college instructor.  I am currently

17   married.  My current husband is retired.  My late husband was

18   a probation and parole agent.

19               I have got a BA and a master's from Cal State Long

20   Beach.  I have three adult children ages 36, 38, and 42.  I

21   have not served on a jury before.

22               THE COURT:  All right.  Thank you.

23               THE PROSPECTIVE JUROR:  My name is Jorge Nanni.  I

24   live a couple blocks away from here in Santa Ana.  I just

25   walked.

```
1              THE COURT:  Wow.
2              THE PROSPECTIVE JUROR:  I just walked.  I'm a tax
3     preparer for the last 40 years.  I am married.  My wife is
4     the manager of my practice.  She fires me and hires me.
5     Every time she rehires me, I ask for a raise.
6              I have an AA degree, and I transferred to Cal State
7     Fullerton for the BA that I couldn't finish.  I have one son,
8     29 years old, finishing his master's degree from Fullerton.
9     He's right now managing my business.  I have never been in
10    the military, and I have never served a jury duty.
11             THE COURT:  Thank you.
12             THE PROSPECTIVE JUROR:  My name is Kelynda Burch.
13    I'm from Seal Beach.  I'm a clerk's helper at Gelson's
14    supermarket.  That means I bag groceries.  I've been doing
15    that for -- it will be four years next month.  Not married.
16    I have an associates degree from Long Beach City College in
17    English, specifically creative writing.  No military.  No
18    children.  I've never been on a jury before.
19             THE COURT:  Thank you.
20             THE PROSPECTIVE JUROR:  My name is Jennifer
21    Hendrix.  I live in Irvine.  I'm currently a part-time
22    self-employed accountant, and I work solely for two
23    companies, Obsidian Entertainment and Dark Rock Industries.
24    They're video-game companies.
25             I'm married.  My husband is a VP of finance for
```

1    Sound Physicians.  I have a bachelor's in business from Cal

2    State Fullerton and an MBA from UCI.  I've not served in the

3    military.  I have two children.  They're 10 and 14.  I have

4    been on a jury.  It was a criminal case, a drug case, and we

5    did come to a verdict.

6              THE COURT:  Thank you.

7              THE PROSPECTIVE JUROR:  My name is Stephanie Moser.

8    I live in Stanton, California.  I am not employed; however, I

9    do work.  I am a stay-at-home mom and housewife.  I have been

10   doing that for the past seven years.

11             Before that, I worked for a transportation

12   machinery moving.  I mentioned I'm married.  My husband works

13   in the oil fields.  He's been doing that for the last eight

14   years.  Before that, he was a long-haul truck driver.  I have

15   one child.  He is ten years old.  I have never been in the

16   military; however, my ex-husband was a Marine.

17             Let's see.  I have not ever served on a jury.

18             THE COURT:  Okay.  Thank you.  Let's move right

19   down to this place here, then, please.

20             THE PROSPECTIVE JUROR:  Hi.  My name is Linda

21   Dourte.  I've been employed at Albertson's for 35 years as a

22   supervisor in the warehouse.  I'm divorced.  I have two

23   children.  I have a 44-year-old daughter.  She's a homemaker

24   with three children.  And I have a 38-year-old son who is

25   medically discharged from the military.  He has five

```
1   children, so I've got a lot of grandkids.
2           My educational background, I did finish high
3   school.  I did a couple of courses in college but I never
4   finished.  I served on jury in both civil and federal court,
5   both criminal.  I mean superior and federal court, both
6   criminal.  And, you know, I can't think right now.
7           THE COURT:  Got it.  Thank you.
8           THE PROSPECTIVE JUROR:  Hi.  I'm West Imboden.  I
9   live in Orange.  I am currently unemployed, so I haven't
10  started my career, let alone retired from it.  I'm not
11  married and I have no current or former spouse.  I got my
12  bachelor's in history from Cal State Long Beach and my JD
13  from Western State.  There's no military service to speak of.
14  No kids.  And I've never served on a jury.
15          THE COURT:  Thank you.
16          THE PROSPECTIVE JUROR:  Hi.  My name is Jeannette
17  Rosel.  I reside in the city of Buena Park.  I am currently a
18  visual merchandiser for Target.  I've been doing that work
19  for ten years now.  I am engaged.  My fiance, he works as an
20  animal technician in UC Irvine.
21          I graduated from high school.  Still attending
22  college.  It's in the process.  Never served in the military.
23  I have a three-year-old daughter, and I am currently
24  expecting the second one.  I have never served on a jury
25  before.
```

```
 1              THE COURT:  Thank you.
 2              THE PROSPECTIVE JUROR:  My name is Myra Kinsey.  I
 3    reside in Fountain Valley.  I'm retired from the mortgage
 4    industry.  My last position was as a funder.  I was in that
 5    line of work for about four years.  I am married, and my
 6    husband's retired.  He was a government contractor, worked
 7    around the world doing military contracts.  He's been in that
 8    line of work for about over 20 years.
 9              I have a degree in English from Cal State
10    Fullerton.  My husband served in the military, initially in
11    the Army and then later on in the Navy reserves.  He retired
12    with the rank of captain.  No children, and I've never served
13    on a jury.
14              THE COURT:  Thank you.
15              THE PROSPECTIVE JUROR:  My name is Virginia David.
16    I reside in Irvine.  I'm a receptionist/administrative
17    assistant for ATI Metals, a metal forging company.  I'm
18    married.  My husband is in the mortgage business.  He's an
19    underwriter/manager.  My divorce was 20 years ago.  He was a
20    garbage man, worked for a private company.  No college.
21    Graduated high school.  Never served in the military.  I have
22    no children, and I've never served on a jury.
23              THE COURT:  Thank you.
24              THE PROSPECTIVE JUROR:  Hello.  I'm Adriana Pulido
25    from Huntington Beach.  I'm currently working at School First
```

```
 1    Federal Credit Union.  I'm a banker there.  I've been there
 2    about two years now.  I'm a student at Santa Ana College.
 3    Business Administration is my major.  I am not married.  No
 4    kids.  And I have -- I'm not in the military, and I have
 5    served jury.  It was civil and we came to a verdict.
 6              THE COURT:  Thanks.
 7              THE PROSPECTIVE JUROR:  I guess last but not least
 8    me.  My name is Elliot Yamashiro.  I live in Irvine.  I am
 9    currently working at Kelley Blue Book.  I've been there for
10    about three years as a senior user experience designer.  I've
11    been in this industry for the past 18 years.  I'm currently
12    married.  My wife is a homemaker.  She has been prior to that
13    her earlier -- earlier on she was working for an import
14    export company, DHL.
15              Let's see.  Educational background, I have a degree
16    from UC Irvine in history, a degree in multimedia from the
17    Art Institute of Seattle, and I did some time in business
18    school, International Business at the Thunderbird in Phoenix,
19    Arizona.
20              THE COURT:  Okay.  Well --
21              THE PROSPECTIVE JUROR:  I wasn't finished yet.
22              THE COURT:  What's that?
23              THE PROSPECTIVE JUROR:  I wasn't finished yet.
24              THE COURT:  Oh, I'm sorry.
25              THE PROSPECTIVE JUROR:  And then as far as
```

```
 1    military, I've not served.  However, my father was in the
 2    Navy.  He was a naval doctor.  I have two children.  They are
 3    13 and 7.  And I've never served on a jury.
 4              THE COURT:  All right.  Thank you for that.  Thank
 5    you for sharing with me.
 6              I said we'd take a break in the morning and a break
 7    in the afternoon.  We're going to take a break now.  We're
 8    moving along well.
 9              I just want to confirm that we have identified
10    three folks who would have a hardship, and no one yet has
11    said they would find it difficult to be fair and impartial.
12    Any changes to that?  Okay.  We'll stick with that, then.
13              I'm going to just read some instructions for you.
14    This is similar to what I'll tell you pretty often, not so
15    long-windedly, but during the course of the trial, this is
16    important.  And since you're taking a break, among the things
17    we'll say here is don't research about this case.  Don't go
18    out and start checking blinds.  And don't even talk about the
19    case.
20              You can't really -- you're not allowed to talk
21    about the case even amongst each other until you deliberate.
22    You've got to each form your opinions.  So that's basically
23    what this says.
24              I will now say a few words about your conduct as
25    potential jurors.  First, keep an open mind throughout the
```

 1    trial and do not decide what the verdict should be until you

 2    and your fellow jurors have completed your deliberations at

 3    the end of the case.

 4         Second, because you must decide this case based

 5    only on the evidence received in the case and on my

 6    instructions as to the law that applies, you must not be

 7    exposed to any other information about the case or to the

 8    issues it involves during the course of your jury duty.

 9         Thus, until the end of the case or unless I tell

10    you otherwise, do not communicate with anyone in any way, and

11    do not let anyone else communicate with you in any way about

12    the merits of the case or anything to do with it.  This

13    includes discussing the case in person, in writing, by phone

14    or electronic means via e-mail, text messaging, or any

15    internet chat room, blog, website, or application including

16    but not limited to Facebook, YouTube, Twitter, Instagram,

17    LinkedIn, Snapchat, or any other form of social media.

18         This applies to communicating with your fellow

19    potential jurors until I give you the case for deliberation,

20    and it applies to communicating with everyone else including

21    your family members, your employer, the media or press, and

22    the people involved in the trial, although you may notify

23    your family and your employer that you have been seated as a

24    juror in the case and how long you expect the trial to last.

25         But if you are asked or approached in any way about

1    your jury service or anything about this case, you must

2    respond that you have been ordered not to discuss the matter

3    and report the contact to the Court.

4         Because you will receive all the evidence and legal

5    instructions you properly may consider to return a verdict,

6    do not read, watch, or listen to any news or media accounts

7    or commentary about the case or anything to do with it.

8         Although I have no information that there will be

9    news reports about this case, do not do any research such as

10   consulting dictionaries, searching the internet, or using

11   other reference materials; and do not make any investigation

12   or in any other way try to learn about the case on your own.

13        Do not visit or view any place discussed in this

14   case, and do not use internet programs or other devices to

15   search for or view any place discussed during the trial.

16        Also, do not do any research about the case, the

17   law, or the people involved, including the parties, the

18   witnesses, or the lawyers until you have been excused as

19   jurors.  If you happen to read or hear anything touching on

20   this case in the media, turn away and report it to me as soon

21   as possible.

22        These rules protect each party's right to have this

23   case decided only on the evidence that has been presented

24   here in court.  Witnesses here in court take an oath to tell

25   the truth, and the accuracy of their testimony is tested

1    through the trial process.  If you do any research or

2    investigation outside the courtroom or gain any information

3    through improper communication, then your verdict may be

4    influenced by inaccurate, incomplete, or misleading

5    information that has not been tested by the trial process.

6           Each of the parties is entitled to a fair trial by

7    an impartial jury.  If you decide the case based on

8    information not presented in court, you will have denied the

9    parties a fair trial.  Remember, you have taken an oath to

10   follow the rules, and it is very important that you follow

11   these rules.

12          A juror who violates these restrictions jeopardizes

13   the fairness of these proceedings and a mistrial could result

14   that would require the entire process to start over.  If any

15   juror is exposed to any outside information, please notify

16   the Court immediately.

17          Okay.  We will now take a break, and we will return

18   at 11:10.  So we'll see you until 11:10.  Thank you.

19          THE CLERK:  All rise.

20          (Open court - jury not present)

21          THE COURT:  All right.  As the potential jurors

22   leave, let me say to the attorneys:  We didn't have any

23   Jewish holiday issues.  We have a fewer number of potential

24   jurors than we normally have.  We have the good news that we

25   only have three potential hardships and a preliminary

1    statement of no for-cause excusals.

2          With all that in mind and keeping in mind that

3    you've not yet had a chance to rehabilitate 4, 8, or 13, and

4    willing to give you that chance if you insist on it, I would

5    still at this time like to excuse 4, 8, and 13.  Is there any

6    objection to that?

7          MR. KNEAFSEY:  None from the plaintiff, Your Honor.

8          MR. STEELE:  None from the defense, Your Honor.

9          THE COURT:  Ms. Bredahl.

10         THE CLERK:  4, 8, and 13?

11         THE COURT:  4, 8, and 13.  Okay.  So Ms. Bredahl

12   will kind of invite them to disappear.  One of the advantages

13   of this system is it doesn't communicate which excuses work

14   or which don't.  They'll just not show up and we will be left

15   with -- how many will that leave us with?  We had 21?

16         THE CLERK:  Yes.

17         THE COURT:  So we'll be left with 18.  Now, you

18   know, with 18, that gives us the potential for four excuses

19   for cause, but I'm just not seeing much in the way of cause.

20   Then I will give you a chance to chat with your folks about

21   your peremptories.

22          You will see that when they come back, I will ask

23   general voir dire questions, and then I'll give you a chance

24   to ask your own questions.  Certainly by noon, I would like

25   to let you folks chat over noon about who your peremptories

1    are.  Are you with me?

2          So let's be ready to have it kind of completed by

3    noon.  You can chat, come back with your peremptories.  We'll

4    excuse the peremptories and get into the jury instructions

5    and opening statement this afternoon.  Okay?

6          MR. KNEAFSEY:  Your Honor, may I raise one issue

7    that came up from Mr. Steele's opening comments?  I'm

8    concerned this is going to be a recurring issue in the trial.

9          As the Court is aware, patent infringement is not a

10   comparison as to whether or not the two devices are

11   identical, the Genes device to the CBC device.  It's, of

12   course, a comparison of the CBC device alone to the claims of

13   the patent.

14         I think the jury -- it's just common sense I think

15   for people to be drawn to looking at the two devices and see

16   if they look alike.  It's misleading and, I think,

17   prejudicial for counsel to be making an argument to that

18   effect.

19         THE COURT:  Okay.  Anything else?

20         MR. KNEAFSEY:  No, Your Honor.

21         THE COURT:  All right.

22         Counsel, you heard him say that.

23         MR. STEELE:  Yeah.  I'm not sure I understand

24   exactly what he's referring to in particular.

25         THE COURT:  To say anything about it at this point

```
 1    would, I think, put too much emphasis on it.
 2              MR. STEELE:  I think in that sense, if I could have
 3    that moment back, I would pull back a little bit.  So I
 4    understand that.
 5              THE COURT:  Okay.  So thanks for raising that.
 6    We'll keep it as it is.  They know that I will tell them what
 7    the law is.
 8              MR. STEELE:  Thank you, Your Honor.
 9              THE COURT:  You, for example, could say:  The judge
10    will tell you what the law is and other comments are not
11    relevant.  You can always say that in your statements.  Okay?
12              MR. KNEAFSEY:  Yes, Your Honor.  I wasn't --
13              THE COURT:  Understood.
14              MR. KNEAFSEY:  Thank you.
15              THE COURT:  It's a loose way of describing what's
16    going on with some technical issues raised by it.
17              All right.  So with that, we're ready to go.  And
18    when did I say we'd come back?
19              MR. KNEAFSEY:  11:10, Your Honor.
20              THE COURT:  All right.  Let's break and come back
21    at 11:10.  We'll dismiss those.  I'll ask a few questions.
22    You'll ask a few questions.  Then we'll be ready to go.
23              Thank you.
24              MR. KNEAFSEY:  Thank you.
25         (Recess taken from 10:57 a.m. until 11:10 a.m.)
```

```
 1              (Open court - jury present)

 2              THE COURT:  Welcome back, everyone.  Please be

 3    seated.  We're moving right along.  I'm going to get into

 4    specific questions.  Our goal here is to see if you can be

 5    fair and impartial.

 6              So we have here a lawsuit where one person, the

 7    plaintiff, is seeking damages from the other person.  That's

 8    the way lawsuits work.  Does anyone have a problem with that?

 9    Some people don't like people suing other people.  And if you

10    have a problem with any of this, let me know.

11              Yes, sir.

12              THE PROSPECTIVE JUROR:  I'm just saying I've been

13    involved in actually two lawsuits.  That's why.  But I don't

14    have a problem with people suing each other.

15              THE COURT:  Okay.  Thank you for letting us know

16    that.

17              THE PROSPECTIVE JUROR:  I just wanted to make that

18    clear.  You know?

19              THE COURT:  Thank you for making that clear.  That

20    raises my next question.  Some of us have been involved in

21    lawsuits.  Some of us have family members or close friends

22    involved in lawsuits.  Maybe they say, oh, I hate all

23    plaintiffs.  Or, oh, I hate all defendants, or anything like

24    that.

25              Let me just ask:  Have any of you had experiences
```

```
 1    with a lawsuit that would make it difficult for you to be

 2    fair and impartial because you come in just convinced one way

 3    or the other?  Okay.  I see no hands on that.

 4          Do any of you have any involvement with blinds?

 5    Maybe you work for a blind company, or you just have strong

 6    feelings about blinds.  I'm intrigued.  I've obviously looked

 7    at this device a lot as the case progressed, but I'm

 8    interested to see how it's going to be presented here.

 9          Does anyone have issues with blinds that would make

10    it difficult for them to be fair and impartial?  Okay.

11          We have different nationalities, maybe accent or

12    language issues.  Does that create a problem for anyone that

13    would make it difficult for you to be fair and impartial?

14    Okay.  I don't see a hand up.

15          Now, patents.  It's in the Constitution.  I handle

16    patent cases.  I also handle lots of other cases, but I

17    handle patent cases.  Sometimes in the news they talk about

18    patents.  Should there be patents?  Should a patent give an

19    inventor the right to monopolize on that invention for a

20    period of time?

21          That's what patents do, and some people don't like

22    that.  Does anyone here have issues with patents that would

23    make it difficult for them to be fair and impartial?  Okay.

24    I see no hands on that.

25          With that, I think I'll turn it over to counsel.
```

```
 1              MR. KNEAFSEY:  Thank you, Your Honor.

 2              THE COURT:  You're welcome.

 3              MR. KNEAFSEY:  Just to follow up on the last

 4    question by Judge Guilford on patents, has anyone ever filed

 5    for a patent application for a patent on something or thought

 6    about it?  No.  Has anyone ever run into a patent in their

 7    line of work?  No.

 8              THE PROSPECTIVE JUROR:  Well, it would -- it was

 9    nothing, but, you know, I created a better idea how to -- for

10    wheelchair tie-downs.  And they never gave me no money.  Just

11    a thank-you.

12              MR. KNEAFSEY:  So, Mr. Brennan, did you apply for a

13    patent on that idea?

14              THE PROSPECTIVE JUROR:  No, I did not.  I mean, you

15    know --

16              MR. KNEAFSEY:  But you had an idea?

17              THE PROSPECTIVE JUROR:  No patents.

18              MR. KNEAFSEY:  Anyone else have an idea that they

19    thought was new and considered filing a patent application

20    for?

21              Mr. Robinson, I understand you have a chemical

22    engineering degree?

23              THE PROSPECTIVE JUROR:  That's right.

24              MR. KNEAFSEY:  Did you work as a chemical engineer.

25              THE PROSPECTIVE JUROR:  I worked as a petroleum
```

1    engineer.

2           MR. KNEAFSEY:  And did you ever run into any

3    patents in your line of work as a petroleum engineer?

4           THE PROSPECTIVE JUROR:  I never filed for a patent.

5    Never had to defend one or anything like that.  I came across

6    a lot of patented devices for sure.

7           MR. KNEAFSEY:  In your line of work?

8           THE PROSPECTIVE JUROR:  In my line of work.

9           MR. KNEAFSEY:  And were those devices that were

10   owned by the company that you worked for?

11          THE PROSPECTIVE JUROR:  No.

12          MR. KNEAFSEY:  And how did you happen to know that

13   they were patented?

14          THE PROSPECTIVE JUROR:  Mostly through salesmen.

15   You know, when you have discussions about using different

16   types of equipment, they'll tell you why theirs is better and

17   whether they have patents on it and those types of things.

18          MR. KNEAFSEY:  Okay.

19          THE PROSPECTIVE JUROR:  Mostly oil field type

20   equipment.

21          MR. KNEAFSEY:  These were like vendors of the

22   company you were working for?

23          THE PROSPECTIVE JUROR:  That's right.

24          MR. KNEAFSEY:  Thank you.

25          Anyone else have any experience with patents or

```
1    hear about anything that's patented?

2            Mr. Nanni, you're a tax preparer?

3            THE PROSPECTIVE JUROR:  Yes, sir.

4            MR. KNEAFSEY:  What does that entail?  Do you have

5    a background in accounting or --

6            THE PROSPECTIVE JUROR:  Yes, sir, in accounting for

7    the last 40 years.  I own my professional practice, and many

8    of my competitors around me were my ex-employees.

9            MR. KNEAFSEY:  And do you offer accounting services

10   or primarily --

11           THE PROSPECTIVE JUROR:  Just the preparation only.

12           MR. KNEAFSEY:  Okay.  And is that for businesses

13   and --

14           THE PROSPECTIVE JUROR:  Businesses and personal.

15           MR. KNEAFSEY:  Okay.  All right.  Thank you very

16   much.

17           No further questions, Your Honor.

18           THE COURT:  All right.  Let's turn to the defense.

19           MR. STEELE:  We'll pass.  We have no questions,

20   Your Honor.

21           THE COURT:  All right.  Well, this has moved along.

22           THE PROSPECTIVE JUROR:  Are you allowed to ask

23   questions?  I don't know if you can answer this.

24           THE COURT:  Okay.  And your question is?

25           THE PROSPECTIVE JUROR:  This was just a segue, a
```

```
 1    question regarding the trial and lawsuits and stuff.
 2              THE COURT:  Yeah.
 3              THE PROSPECTIVE JUROR:  Are you allowed to disclose
 4    whether the parties attended a mediation as part of this
 5    process, or did they go right to court?
 6              THE COURT:  Let me ask the parties.  I'm prepared
 7    to tell them what the requirements of this Court are, which
 8    you are well aware of, and to say you've complied.  May I say
 9    that?
10              MR. STEELE:  You may.
11              MR. KNEAFSEY:  Yes, Your Honor.
12              THE COURT:  Yes?  Okay.  So this Court requires
13    mediation.  In fact, sometimes I say:  Before we take up the
14    time of a jury, you must have met with a third-party
15    mediator.  They have done that here.
16              That's a good question.  You could've -- you know,
17    when I asked the question, you could've said, well, I have no
18    problem with lawsuits, but I want to know if they mediated.
19    So we've told you that answer.
20              Okay.  Well, let me ask the parties:  How long
21    would it take each of you to fill out your form in talking
22    with your client?  Are you with me?
23              MR. KNEAFSEY:  Yes, Your Honor.  Five, ten minutes
24    at the most.
25              THE COURT:  Five or ten minutes.  What do you say?
```

```
 1              MR. STEELE:  Ten minutes.

 2              THE COURT:  Okay.  I'm trying to see what's most

 3    efficient.  We're actually getting close now to picking a

 4    jury.  Would you mind just sitting at your table talking with

 5    your client?  That gives you a visual.  Sometimes that's

 6    helpful.

 7              MR. KNEAFSEY:  That's fine, Your Honor.

 8              THE COURT:  Okay.  So the attorneys are going to be

 9    talking to their clients for five or ten minutes.  Get out

10    your forms and tell me when you're ready.

11              In the meantime, feel free to stand up, stretch, or

12    do whatever.  Okay?

13              Let me just remind the lawyers, you know, the math,

14    eight plus six is all that's in play.  Okay.  Got it?  So

15    just talk amongst yourselves and let me know when you're

16    ready.  In the meantime, stretch or do whatever you want.

17              So this jury selection process is something where

18    we're trying to get a fair and impartial jury, and it

19    requires us first to look at hardship, which we've looked at.

20    And I appreciate the willingness of so many of you to serve.

21              Then we look at if people are just so tied into

22    something that they can't be fair and impartial.  You can

23    imagine in a police brutality case these days, there's some

24    people that just say they can't be fair, and we've gone

25    through that.
```

1        And then under the law, the law allows each side

2   just to say there's three people I don't want.  They don't

3   have to give a reason.  It's just their gut feeling.  That's

4   what we're doing right now, and they're making their

5   determination as to the three they don't want.  Sometimes

6   that's in consultation with their client.  Actually I thought

7   they would be doing that at lunch hour, but we've moved along

8   so promptly that we are at this point.

9        Now, in state court, you know, there's various ways

10  to pick a jury.  Usually in state court you have one side

11  standing up saying I thank and excuse juror number three, and

12  the other side stands up and says I thank and excuse juror

13  number six.

14       In state court usually they have more chances to

15  excuse people.  Here it's fewer chances.  It's three.  So the

16  attorneys will tell me when they're ready to roll, and we'll

17  go from there.

18       Let's also talk for a moment about size of juries.

19  You know, in state court, if you've been there, it's always

20  12, 12 for civil cases, 12 for criminal cases.  Here it's 12

21  for criminal cases, an it has to be unanimous.  But it is

22  only six for civil cases, and it has to be unanimous.

23       So civil juries are smaller here, six instead of

24  12.  And the practice is to add two extras to make sure we

25  don't run out.  So in federal court most juries are eight

1   people, and we are getting very close here to determining

2   which eight of you will sit.  So that's less than there is in

3   state court.  Just different ways.

4            Different states do it differently, too, on the

5   issue of whether it has to be unanimous or not.  In

6   California you need nine out of the 12 for a civil case.  It

7   doesn't have to be unanimous.  Here again it has to be

8   unanimous.  It's going to need to be eight out of eight.

9            So how is counsel coming?

10           MR. STEELE:  We're close, Your Honor.  We're

11  listening --

12           THE COURT:  I'm sorry.  I didn't want to be

13  distracting.  I was just trying to keep the jury's attention.

14           Feel free.  Sorry.

15      (Recess taken from 11:22 a.m. until 11:27 a.m.)

16           MR. KNEAFSEY:  The plaintiffs are ready, Your

17  Honor.

18           THE COURT:  Thank you for that.

19           MR. STEELE:  The defense is ready.

20           THE COURT:  Okay.  Could you hand up your pieces of

21  paper.

22           All right.  I'm going to mix the order up here, and

23  I'm going to thank and excuse the following people.  I'm

24  going to name six people to be thanked and excused.  When I

25  do that, I wonder if you could just stand until I list

```
 1   everyone.  Okay?
 2          So, juror number 11, Mr. Nanni, thank you, sir.
 3   Juror number 16, Mr. Imboden, thank you.  Lawyers have a
 4   tough time making it.  You're Western State; right?  That's
 5   why I never made it from my 30 years as a lawyer.
 6          All right.  Number 10, Ms. Ryan.  You know, I say
 7   lawyers have a tough time, but the chief judge of California
 8   has sat on a jury.  So maybe some day I will sit over on
 9   state court.
10          All right.  Number 12, Ms. Burch.  Thank you,
11   Ms. Burch.  Number 6, Mr. Brennan.  Ah, Mr. Brennan, you're a
12   delightful person with your beautiful wife and your charming
13   children.
14          THE PROSPECTIVE JUROR:  I get along with them.
15   That's really good.
16          THE COURT:  Oh, darn.  I always had to explain to
17   my father:  Why did they let me go?  I'm a good guy.  Well,
18   you are.  You're a great guy.  Sometimes I don't know what
19   goes into people's calculations.
20          Then number three, Mr. Victor Silva.  All right.
21   So it looks like we have six people.  Does that confirm with
22   your understanding?  I can give you -- do you want your
23   sheets back again?  Are we all confirmed?
24          MR. STEELE:  We're confirmed.
25          MR. KNEAFSEY:  Your Honor, may I see the sheet
```

```
 1    back?
 2              THE COURT:  Yes, you may.
 3              Wait a minute.  So we have juror number 3.  We have
 4    juror number 6.  We have juror number 10, Ms. Ryan.  Yeah.
 5    Juror number 11, Mr. Nanni.  Juror number 12, Ms. Burch, and
 6    juror number 16.  That's what I have.  Let me hand these out
 7    to you.
 8              Are we correct?
 9              MR. KNEAFSEY:  Yes, Your Honor.  Thank you.
10              THE COURT:  Are we correct from the defense?
11              MR. STEELE:  Correct.
12              THE COURT:  Okay.  May I ask you six to leave with
13    our great appreciation and actually sadness.  You can always
14    come back in and watch it if you want, learn all about
15    blinds.
16              Okay.  Now, the way this system works is the first
17    eight remaining are our jurors.
18              So, Ms. Bredahl, who are the first eight remaining?
19    I see we've got six in the box, and we'll need two in the
20    back; right?
21              THE CLERK:  The six in the box and Ms. Dourte and
22    Ms. Rosel.
23              THE COURT:  The first two in the back.  So please
24    come forward.  May I have you two come forward.  And may I
25    thank and excuse everyone else.  Thank you for sitting here.
```

1    I'm glad we efficiently got you back on the road.

2            Ms. Bredahl is now going to sit people where they

3    belong.  Again, I thank you all.  Number 21 back there, thank

4    you.

5            All right.  Thank you.  We're moving along with

6    good speed.  I appreciate all your patience, and I really

7    appreciate your willingness to serve.  I hope you find it

8    enjoyable, and we're ahead of schedule.

9            Ms. Bredahl.

10           (Jury sworn)

11           THE COURT:  All right.  Be seated.  I'm going read

12   some preliminary instructions.  This will give you some

13   general ideas.  We might even have a movie as part of these

14   instructions.  These instructions will give you a general

15   idea of what we're about to do.

16           Now, these instructions I read to you, you will

17   have when you deliberate.  We'll put they together in a

18   package and you'll have them.  We'll talk about taking notes.

19   You can take notes as I read these instructions or you may

20   not want to take notes, but you'll have the instructions when

21   you deliberate whether or not you take notes.  So here we go.

22           Member of the jury, you are now the jury in this

23   case.  It is my duty to instruct you on the law.  It is your

24   duty to find the facts from all the evidence in the case.  To

25   those facts you will apply the law as I give it to you.  You

1    must follow the law as I give it to you whether you agree

2    with it or not.

3          You must not be influenced by any personal likes or

4    dislikes, opinions, prejudices, or sympathy.  That means you

5    must decide the case solely on the evidence before you.  You

6    just took an oath to do that.  At the end of the trial, I

7    will give you final instructions.

8          Please to not read into these instructions or

9    anything I may say or do that I have an opinion regarding the

10   evidence or what your verdict should be.

11         Now let's talk about patents.  What is a patent and

12   how is one obtained?  This case involves a dispute relating

13   to a United States patent.  Before summarizing the positions

14   of the parties and the issues involved in the dispute, let me

15   take a moment to explain what a patent is and how one is

16   obtained.

17         Let me ask the parties to show the video whenever

18   they like.  I think it's at the end of this one as I look.

19   Okay.  Good.

20         Patents are granted by the United States Patent and

21   Trademark Office, sometimes called the PTO, patent trademark

22   office.  A valid United States patent gives the patentholder

23   the right for up to 20 years from the date the patent

24   application was filed to prevent others from making, using,

25   offering to sell, or selling the patented invention within

1    the United States, or from importing it into the

2    United States without the patentholder's permission.

3              A violation of the patentholder's right is called

4    infringement.  The patentholder may try to enforce a patent

5    against persons believed to be infringers by a lawsuit filed

6    in federal court.

7              The process of obtaining a patent is called patent

8    prosecution.  To obtain a patent, one must first file an

9    application with the PTO.  And the PTO is an agency of the

10   federal government and employs trained examiners who review

11   applications for patents.

12             The application includes what is called a

13   specification which contains a written description of the

14   claimed invention telling what the invention is, how it

15   works, how to make it, and how to use it.

16             The specification concludes with one or more

17   numbered sentences.  These are the patent claims.  When the

18   patent is eventually granted by the PTO, the claims define

19   the boundaries of its protection and give notice to the

20   public of those boundaries.

21             After the applicant files the application, an

22   examiner reviews the application to determine whether or not

23   the claims are patentable.  That means appropriate for patent

24   protection and whether or not the specification adequately

25   describes the invention claimed.

1          In examining a patent application, the examiner

2     reviews certain information about the state of the technology

3     at the time the application was filed.  The PTO searches for

4     and reviews information that is publicly available or that is

5     submitted by the applicant.  This information is called prior

6     art.  Prior art.  It's a word used a lot in patents.

7          The examiner reviews this prior art to determine

8     whether or not the invention is truly an advance over the

9     state of the art at the time.  Prior art is defined by law,

10    and I will give you at a later time during the instructions

11    specific instructions as to what constitutes prior art.

12         However, in general prior art includes information

13    that demonstrates the state of technology that existed before

14    the claimed invention was made or before the application was

15    filed.  A patent lists the prior art that the examiner

16    considered.  This list is called the cited references.

17         After the prior art search and examination of the

18    application, the examiner informs the applicant in writing of

19    what the examiner has found and whether the examiner

20    considers any claim to be patentable and thus would be

21    allowed.

22         This writing from the examiner is called an office

23    action.  If the examiner rejects the claims, the applicant

24    has an opportunity to respond to the examiner to try to

25    persuade the examiner to allow the claims and to change the

1    claims or to submit new claims.

2         This process may go back and forth for some time

3    until the examiner is satisfied that the application meets

4    the requirements for a patent and the application issues as a

5    patent, or that the application should be rejected and no

6    patent should issue.

7         Sometimes patents are issued after appeal within

8    the PTO or to a Court.  The papers generated during these

9    communications between the examiner and the applicant are

10   called the prosecution history.

11        The fact that the PTO grants a patent does not

12   necessarily mean that any invention claimed in the patent in

13   fact deserves the protection of a patent.  For example, the

14   PTO may not have had available to it all other prior art that

15   will be presented to you.

16        A person accused of infringement has the right to

17   argue here in federal court that a claimed invention in the

18   patent is invalid because it does not meet the requirements

19   for a patent.  It is your job to consider the evidence

20   presented by the parties and determine independently whether

21   or not CBC, the defendant, has proven that the patent is

22   invalid.

23        You will now watch a video, a movie prepared by the

24   federal courts to further explain the patent system.

25        Please play.

1          By the way, I should say this is about 16 minutes

2     long.

3          (Videotape recording played)

4          THE COURT:  Thank you for sharing that.  It's an

5     interesting little form.  You'll note that we didn't give you

6     the form as they mentioned in the film here.  It will be an

7     exhibit in this case and you'll have it with you when you

8     deliberate.

9          I'm always amused by that little film.  Judge

10    Fogel, who did all the talking, is an old friend of mine.  He

11    started off in San Francisco, and now he's in charge of

12    education for the whole country.  It's a pretty nice district

13    court that they show there in Washington, D.C., and I think

14    that film does give us a general overview of what's going on

15    with patents.

16         You know, whenever anything is complicated, the

17    basic thing to do is just understand the words.  It's always

18    puzzled me a little bit that patents have a few weird words

19    like prior art.  It has nothing to do with artists.  It just

20    has to do with the matter involved.

21         Then they have this word prosecution.  That sounds

22    like a criminal defendant or something, but prosecution just

23    means processing the patent application.  And we have this

24    word file wrapper.  That's used to describe the papers used

25    in the prosecution.  So prior art, prosecution, file

```
 1    wrapper -- we've got these issues.

 2              I hope that little film helped you out.

 3              We will -- I think now is a good time to take a

 4    break.  When we come back at 1:30, I'll finish with these

 5    instructions and we'll get right into the case with the

 6    opening statement of counsel and moving on.

 7              Is that all right with everyone?  Okay.

 8              So I read you that long instruction about don't

 9    discuss the case and Twitter and Instagram.  That applies

10    when you take breaks.  I can sum it up by saying keep an open

11    mind, don't research the case, and don't discuss the case.

12              We'll see you at 1:30.  Thanks.

13              THE CLERK:  All rise.

14              (Open court - jury not present)

15              THE COURT:  Anything further from counsel?  Hearing

16    nothing --

17              MR. STEELE:  Just one issue.  We did have a

18    disagreement on one of the exhibits that didn't make it into

19    the joint books, joint exhibit books.  It's one that consists

20    effectively of a picture of the accused device, the

21    plaintiff's device, and another device that is another

22    competitor in the area with respect to damages.  We'd like to

23    address that.  I thought it was going to be in the exhibit --

24              THE COURT:  All right.  Let me ask this.  Let's cut

25    to the chase.  Do you have a copy of this?
```

1          MR. STEELE:  We do.  It was an exhibit that was --
2     we don't have a copy as an exhibit.
3          THE COURT:  Is there a way I can look at it?
4          MR. STEELE:  Yes.
5          THE COURT:  How can I look at it?
6          MR. STEELE:  It's in the trial brief.
7          MR. KNEAFSEY:  We objected to the introduction of
8     this exhibit.  We discussed it in our --
9          THE COURT:  Hold on.  Let's get to step one.  I can
10    find it in the trial brief?
11         MR. KNEAFSEY:  Yes.  It's Exhibit 1, the only
12    exhibit, I believe, to the trial brief.
13         THE COURT:  All right.  I'm looking at the trial
14    brief, and the exhibit looks like this?
15         MR. STEELE:  Yes.
16         THE COURT:  Okay.  Does it have a number, by the
17    way?
18         MR. KNEAFSEY:  It doesn't, Your Honor.
19         THE COURT:  Okay.  So this is page -- this is in
20    document 114-1 filed on September 26th.  It's page 4 of 5
21    from what I'm looking at.  The defense moves its admission.
22    The plaintiff objects.
23         What is the plaintiff's objection?
24         MR. KNEAFSEY:  Your Honor, this was not in the
25    parties' joint exhibit list.  It's something that was

```
1    provided about three and a half weeks ago.

2          We object because --

3          THE COURT:  Who was it provided from, from who to

4    who?

5          MR. KNEAFSEY:  It was provided from Mr. Steele to

6    my office, and I informed Mr. Steele that we would be

7    objecting to its admission.  We object on several grounds.

8          First, this document appears to go to that same

9    issue that the Court -- we discussed with the Court this

10   morning, whether or not the anchor lug serves to firmly

11   attach.

12         THE COURT:  Here's what I'd like you to do.  Can

13   you switch that elmo to document camera, please.

14         Do you have a copy of the document?

15         MR. KNEAFSEY:  I don't know that I do, Your Honor.

16         THE COURT:  Can you come forward and get this

17   document?

18         MR. KNEAFSEY:  I can pull it up on my computer,

19   though.

20         THE COURT:  This way you can point with your

21   finger.  Talk to me.

22         Can you zoom out so we can see the whole thing?

23   There's a zoom button.  Okay.

24         MR. KNEAFSEY:  Your Honor, we didn't have any

25   opportunity to conduct any discovery on this, but what this
```

1    appears to be is a comparison between the CBC cord tilter

2    which I'm pointing to here, the Genes cord tilter, what I'm

3    pointing to here, and some cord tilter I've never seen

4    before.

5            Unfortunately when I filed this -- I didn't prepare

6    this document.  It was e-mailed to counsel.  I believe what

7    is contained -- and I can pull it on the computer -- are

8    descriptions that talk about how the CBC cord tilter is

9    not -- is loose and not firmly attached, which is directly

10   the noninfringement position that we objected to.

11           And then an argument that the Genes cord tilter is

12   filmily attached, which we have two problems with.  The first

13   is the -- how the Genes tilter attaches is irrelevant.

14   Again, it's comparison of the claim language to the prior --

15   to the CBC cord tilter and not to the Genes cord tilter.

16           Second, it violates the Court's motion in limine

17   where this argument wasn't allowed to be made.

18           Third, this -- I've never seen this third cord

19   tilter before, and I can't understand why it has any

20   relevance to the infringement or noninfringement issues in

21   the case.

22           The exhibit goes on in subsequent pages to talk

23   about a patent that I've never seen before and --

24           THE COURT:  All right.  Hold on.  Are we just

25   talking about this first page or all the subsequent pages?

1    You can answer that yes or no.

2              MR. STEELE:  All subsequent pages.

3              THE COURT:  Okay.

4              MR. STEELE:  May I --

5              THE COURT:  Are you finished talking?

6              MR. KNEAFSEY:  Yes.  I -- yes, Your Honor.

7              THE COURT:  Okay.  Let's hear from the defense.

8              MR. STEELE:  There are several pages.  The page I'm

9    most concerned with is not exactly this one.  The point of

10   this is not with respect to the infringement issue, although

11   it may have some bearing to it.  But that wasn't the original

12   intent.

13             The picture itself and the descriptions are merely

14   to help the jury understand specifically with respect to

15   damages that this is not a binary market.  Now, that comes up

16   because their damages expert makes some assertions about

17   damages that assume that there's one-for-one association with

18   the device.  If we don't buy theirs and they -- if they don't

19   buy theirs, they have to buy ours, meaning every lost sale is

20   one attributed to them.

21             The point is there are a lot of people in that

22   market with similar devices.  In part that's what this

23   document is really designed to address, that there are other

24   alternatives within the market.

25             Now, there might be some relevance to the

1    infringement, but that's not really the primary issue of

2    this.  The primary issue is really with the damages, to rebut

3    the assertion that there's a binary marketplace in which

4    there are only two competitors that matter and nobody else

5    matters with respect to any sales.  So any lost sale due to

6    an accused infringing device is one that must be attributed

7    to the plaintiff, which is contrary to law and contrary to

8    fact.

9            THE COURT:  Response.

10           MR. KNEAFSEY:  Your Honor, this device, I don't

11   know what it is.  It wasn't disclosed in discovery.  The

12   issue, as I understand it, goes to adequate noninfringing

13   alternatives.  We haven't had the opportunity to analyze

14   whatever this device is or anything about it to evaluate

15   whether or not it would constitute an adequate noninfringing

16   alternative for purposes of the lost profits analysis.

17           THE COURT:  Okay.  Here's my ruling for now, and it

18   will be my ruling for now.  In opening statement Mr. Steele,

19   if he wishes, can reference that there are other products

20   besides the two performing this function or performing a

21   blind function.

22           He can say that in opening, but he can't use this

23   exhibit in opening.  He can say that in cross-examination of

24   the damages expert.  He can ask the damages expert are there

25   others out there performing a related function.  And

```
 1   depending on the answer will depend on whether we can use

 2   this exhibit.

 3         For now, it can't be used in opening.  We'll see if

 4   it gets used later.  But in all events, Mr. Steele can

 5   respond -- can inform the jury in his cross-examination that

 6   there are other competitors out there even without using this

 7   exhibit.  Again, depending on the answer, we'll see.  And

 8   depending on what further develops, we'll see.

 9         For now, it cannot be used in opening.  That's

10   where we're at.  Thank you.

11         MR. KNEAFSEY:  Thank you, Your Honor.

12             (Recess taken at 12:06 p.m.)

13                       CERTIFICATE

14   I HEREBY CERTIFY THAT THE FOREGOING IS A TRUE AND CORRECT

15   TRANSCRIPT OF THE STENOGRAPHICALLY RECORDED PROCEEDINGS IN

16   THE ABOVE MATTER.

17   FEES CHARGED FOR THIS TRANSCRIPT, LESS ANY CIRCUIT FEE

18   REDUCTION AND/OR DEPOSIT, ARE IN CONFORMANCE WITH THE

19   REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

20

21   /s/ Miriam V. Baird              10/04/2017

22   MIRIAM V. BAIRD                        DATE
     OFFICIAL REPORTER
23

24

25
```